UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ERIK PRINCE,

                    Plaintiff,

-against-

THE INTERCEPT, et al.,

                    Defendants.

---

21-CV-10075 (LAP)

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court are (1) Defendants First Look Media Works, Inc. n/k/a First Look Institute, Inc.'s ("First Look") and Matthew Cole's (together, the "First Look Defendants") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and New York's "anti-strategic litigation against public participation" ("anti-SLAPP") statute, New York Civil Rights Law § 76-a,[1] and (2) Defendant Alex Emmons's motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and (b)(6) and New York's anti-SLAPP statute.[2]  Plaintiff Erik Prince

---

[1] (See Notice of Mot., dated Feb. 11, 2022 [dkt. no. 15]; see also Mem. of Law in Supp. of Mot. to Dismiss of Defs. First Look Media Works, Inc. and Matthew Cole ("First Look Br."), dated Feb. 11, 2022 [dkt. no. 16]; Reply in Supp. of Mot. to Dismiss of Defs. First Look and Matthew Cole ("First Look Reply"), dated Mar. 28, 2022 [dkt. no. 34].)

[2] (See Notice of Mot. of Def. Alex Emmons, dated Feb. 28, 2022 [dkt. no. 21]; see also Def. Alex Emmons' Mem. of Law in Supp. of Mot. to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim ("Emmons Br."), dated Feb. 28, 2022 [dkt. no. 22]; Def. Alex Emmons' Reply in Supp. of Mot. to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim ("Emmons Reply"), dated Mar. 28, 2022 [dkt. no. 35].)

opposes the motions.[3]  For the reasons stated below, Defendants'
motions to dismiss are GRANTED.

I.   **Background[4]**

   a. **Factual Background**

      i.  The Parties

Plaintiff Erik Prince is an American businessman and former
U.S. Navy SEAL officer who gained notoriety for founding the
private military company Blackwater, which secured U.S.
government contracts including, "providing support for
government agencies in the aftermath of the bombing of the
U.S.S. Cole in Yemen, assisting in the hunt for Osama Bin Laden
following the September 11, 2001 attacks, providing support and
training in Iraq and Afghanistan, and protecting domestic
government facilities following Hurricane Katrina." (Compl.
¶¶ 21-22.)  After Plaintiff sold his interest in Blackwater in
2010, Plaintiff founded the private equity firm Frontier
Resources Group, "which invests in various companies in the
natural resources, logistics, and transport spaces." (Id.
¶ 22.)  He also served until April 2021 as an Executive Director

_____

[3] (See Pl.'s Consolidated Mem. of Law in Opp. to Defs.' Mots. To
Dismiss ("Pl. Br."), dated Mar. 21, 2022 [dkt. no. 29].)
[4] The facts in this opinion are primarily drawn from Plaintiff's
Complaint ("Compl." [dkt. no. 1]), which is the operative
pleading in this case, as well as the exhibits attached to the
Declaration of Jay Ward Brown [dkt. no. 17]: Matthew Cole and
Alex Emmons, Erik Prince Offered Lethal Services to Sanctioned
Russian Mercenary Firm Wagner, The Intercept (Apr. 13, 2020).

and Vice Chairman of Frontier Services Group, which provides
"integrated security, logistics, insurance, and infrastructure
services for clients operating in frontier markets."  (Id.)

Plaintiff is also well-known for his involvement in
politics, particularly in the Trump administration.  He is the
brother of former U.S. Secretary of Education Betsy DeVos, (see
id. ¶ 56), a public advocate and donor of President Trump, (see
id. ¶ 32; dkt. no. 17 ("Brown Decl."), Ex. 1 at 4), and a former
unofficial advisor to President Trump on military and foreign
policy issues.  (See Brown Decl., Ex. 1 at 4.)

Defendant First Look is a media company—founded by Pierre
Omidyar (founder of eBay)—that owns and operates the online
nonprofit news publication The Intercept since 2013.  (Compl.
¶¶ 13, 23.)  The Intercept is funded by Mr. Omidyar and reader
donations.  (Id. ¶¶ 25, 26.)  Defendants Matthew Cole and Alex
Emmons were national security reporters for The Intercept at the
time the disputed article was published.  (Id. ¶¶ 14, 15.)

### ii.  The Alleged Defamation

Plaintiff claims that an August 13, 2020 article (the
"Article") written by Mr. Cole and Mr. Emmons and published by
The Intercept defamed Plaintiff by portraying him as meeting

"with a top official of Russia's Wagner Group[5] and offer[ing] his mercenary forces to support the firm's operations in Libya and Mozambique."  (Id. ¶ 4.)  Specifically, Plaintiff alleges that Defendants published seven defamatory statements in the Article. (Id. ¶ 41.)

Plaintiff denies that he (1) met an "official from or representative of the Wagner Group," (2) "offered his services to support the Wagner Group's operations in Libya and Mozambique," or (3) "sent the Wagner Group a proposal to offer his services in Libya and Mozambique."  (Id. ¶ 5.)  Plaintiff also denies "caus[ing] any third party to meet with or submit a proposal to the Wagner Group on his behalf."  (Id.)  Because counsel for Plaintiff conveyed to Mr. Cole Plaintiff's denial that he met representatives of the Wagner Group prior to the Article's publication, Plaintiff contends that Defendants published the statements with knowledge of their falsity.  (Id. ¶ 45.)  Defendants included this denial in the published Article.  (See Brown Decl., Ex. 1 at 2.)  Rather than engage with Plaintiff about the details of their allegations, Plaintiff

---

[5] The Article described the Wagner Group as "a semi-private military force that operates in countries or conflicts where the Russian government seeks plausible deniability for its activities, but which is often equipped and supported directly by the Russian Ministry of Defense." (Compl. ¶ 38 (internal quotation marks omitted).)

alleges that Defendants published each of the disputed statements based on anonymous sources.  (Id. ¶ 42.)

Plaintiff contends that the Article accuses him of being "a criminal and disloyal to his nation" by claiming that he "engaged in illegal conduct and violated U.S. and U.N. sanctions and U.S. arms trafficking regulations by allegedly soliciting business from Wagner Group."  (Id. ¶ 74.)  These allegations have allegedly caused substantial harm and special damages to Plaintiff in the form of, among other things, monetary loss, injury to reputation and good will, and loss of profits.  (Id. ¶ 75.)

The Article was subsequently republished by news outlets including, but not limited to, the Daily Beast, The Intellectualist, and The Moscow Times.  (Id. ¶¶ 55-60.)

### b. Procedural Background

Plaintiff filed suit against Defendants in this District on November 24, 2021, asserting claims for defamation per se and defamation per quod.  (See Compl.)  The First Look Defendants moved to dismiss the complaint (the "Complaint") for failure to state a claim on February 11, 2022.  (See First Look Br.) Defendant Alex Emmons separately filed his motion to dismiss the claims against him in the Complaint for lack of personal jurisdiction and joined the First Look Defendants' motion to dismiss the Complaint for failure to state a claim on March 22,

2022.  (See Emmons Br.)  Plaintiff filed his opposition
submission on March 21, 2022, (see Pl. Br.), and the First Look
Defendants and Mr. Emmons filed separate reply submissions on
March 28, 2022.  (See First Look Reply, Emmons Reply.)

> II.  **Legal Standards**

> **a. Fed. R. Civ. P. 12(b)(2)**

On a motion to dismiss for lack of personal jurisdiction
pursuant to Rule 12(b)(2) of the Federal Rules of Civil
Procedure, "[a] plaintiff bears the burden of demonstrating
personal jurisdiction over a person or entity against whom it
seeks to bring suit."  Troma Entm't, Inc. v. Centennial Pictures
Inc., 729 F.3d 215, 217 (2d Cir. 2013) (quoting Penguin Grp.
(USA) Inc. v. Am. Buddha, 609 F.3d 30, 34 (2d Cir. 2010)).  "In
order to survive a motion to dismiss for lack of personal
jurisdiction, a plaintiff must make a prima facie showing that
jurisdiction exists."  Eades v. Kennedy, PC Law Offices, 799
F.3d 161, 167-68 (2d Cir. 2015).  "Th[at] prima facie showing
must include an averment of facts that, if credited by the
ultimate trier of fact, would suffice to establish jurisdiction
over the defendant."  O'Neill v. Asat Tr. Reg. (In re Terrorist
Attacks on Sept. 11, 2001), 714 F.3d 659, 673 (2d Cir. 2013)
(quotation marks omitted).

"In evaluating whether the requisite showing has been
made," the Court must "construe the pleadings and any supporting

materials in the light most favorable to the plaintiffs."[6]  The Court will not, however, "draw argumentative inferences in the plaintiff's favor."  O'Neill, 714 F.3d at 673.

### b. Fed. R. Civ. P. 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  In re Actos End-Payor Antitrust Litig., 848 F.3d 89, 97 (2d Cir. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  That "standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Palin v. N.Y. Times Co., 940 F.3d 804, 810 (2d Cir. 2019).  Evaluating "whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.

---

[6] Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 167 (2d Cir. 2013).  "[C]ourts may rely on . . . materials outside the pleading[s] when ruling on 12(b)(2) motions."  Mount Whitney Invs., LLP v. Goldman Morgenstern & Partners Consulting, LLC, No. 15 Civ. 4479 (ER), 2017 WL 1102669, at *3 (S.D.N.Y. Mar. 23, 2017).

When considering a motion to dismiss, the Court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences" in the plaintiff's favor. Dane v. UnitedHealthcare Ins. Co., 974 F.3d 183, 188 (2d Cir. 2020). The Court is not required, however, "to credit conclusory allegations or legal conclusions couched as factual allegations." Id. (ellipsis omitted). "Accordingly, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (cleaned up).

In determining the sufficiency of a claim under Rule 12(b)(6), the court may review only the complaint, documents attached to the complaint or incorporated into it by reference, and documents "integral" to the plaintiff's allegations, even if not explicitly incorporated by reference. Biro v. Conde Nast (Biro I), 883 F. Supp. 2d 441, 455 (S.D.N.Y. 2012); see id. (noting that in a defamation action these documents typically include "the documents containing the allegedly defamatory statements").

The court may also review documents subject to judicial notice. The Court of Appeals has explained, "[a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related

filings." Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) (quoting Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998)).

### III. Discussion

#### a. Personal Jurisdiction Over Defendant Alex Emmons

##### i. Judicial Estoppel

Plaintiff argues that Mr. Emmons is judicially estopped from challenging the Court's jurisdiction over him because in litigation against Defendants in the U.S. District Court for the District of Wyoming (the "Wyoming Action"),[7] Mr. Emmons stated that New York courts have personal jurisdiction over him.[8] (See Pl. Br. at 6-8.) It is well established that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position,

---

[7] Plaintiff filed suit against Defendants in the U.S. District Court for the District of Wyoming (the "Wyoming court") on May 19, 2020. (Pl. Br. at 5.) Defendants moved to dismiss pursuant to Rules 12(b)(2) and (b)(6). (Id.) On January 15, 2021, the Wyoming court dismissed the complaint on the basis that it did not have personal jurisdiction over Defendants. (Id. at 6.)
[8] Specifically, on November 5, 2020, the Wyoming court ordered the parties to submit supplemental briefing on "the issue of transferring the case or permitting jurisdictional discovery in the event the Court has concerns about personal jurisdiction." (See dkt. no. 31, Ex. A.) In responding to Plaintiff's supplemental brief, Defendants stated, "Defendants here do not dispute that New York courts have jurisdiction over them." (See id., Ex. C at 9 n.8.)

especially if it be to the prejudice of the party who acquiesced in the position formerly taken by him." New Hampshire v. Maine, 532 U.S. 742, 749 (2001).  Mr. Emmons opposes, arguing that "none of the elements required for a finding of judicial estoppel is present here."  (See Emmons Reply at 2.)

In determining whether to apply the doctrine of judicial estoppel, courts generally consider the existence of three factors: (1) whether a party's new position is "clearly inconsistent" with its earlier position; (2) whether the party seeking to assert this new position previously persuaded a court to accept its earlier position; and (3) whether the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." New Hampshire, 532 U.S. at 750-51; see also Intellivision v. Microsoft Corp., 484 F. App'x 616, 619 (2d Cir. 2012).

Regarding the first factor, the Court considers "the contexts in which apparently contradictory statements are made to determine if there is, in fact, direct and irreconcilable contradiction." Rodal v. Anesthesia Grp. Of Onondaga, P.C., 369 F.3d 113, 119 (2d Cir. 2004).  In November 2020, when the parties submitted supplemental briefing in the Wyoming Action, Mr. Emmons was employed by First Look.  (See Emmons Br. at 2-3.) However, in June 2021, before Plaintiff filed the Complaint, Mr. Emmons resigned from First Look to attend graduate school in

Connecticut.  (See dkt. no. 23 ("Emmons Decl.") ¶ 12; Emmons Br. at 3-4.)  Based on Mr. Emmons's change in employment and domicile between the dismissal of the Wyoming Action and the filing of the Complaint, the Court does not find that Mr. Emmons's current position regarding jurisdiction is "clearly inconsistent" with his statement in the Wyoming Action.  Thus, the Court finds that the first factor favors Mr. Emmons.

Turning to the second factor, in the Wyoming Action, Mr. Emmons did not affirmatively seek to transfer venue;[9] rather, he argued that the Wyoming court should dismiss the complaint, analyzing how factors courts consider when determining a potential transfer weighed against transfer to this district. (See dkt. no. 31, Ex. C. at 9.)  Based on the record, Mr. Emmons persuaded the Wyoming court that transfer was not in the interest of justice, not that New York courts had jurisdiction over him.[10]  Because the Wyoming court dismissed the Wyoming Action for lack of jurisdiction and declined to transfer venue

---

[9] In the Order of Dismissal, the Wyoming court acknowledged Mr. Emmons's position, stating that "Defendants likewise do not believe transfer is in the interest of justice."  (Brown Decl., Ex. 15 at 8.)

[10] In the Order of Dismissal, the Wyoming Court stated, "Mr. Prince claims this action could have been filed in the Southern District of New York.  Defendants do not dispute that New York courts have jurisdiction over them.  However, the Court does not believe transfer is in the interest of justice, so it will dismiss Mr. Prince's Complaint for lack of personal jurisdiction."  (Brown Decl., Ex. 15 at 21 (internal citations omitted) (emphasis added).)

to this district, the Court finds that (1) Mr. Emmons did not persuade the Wyoming court that New York courts have personal jurisdiction over him; and (2) the Wyoming court need not have accepted the accuracy of Mr. Emmons's statement regarding jurisdiction to dismiss the complaint. See In re Adelphia Recovery Tr., 634 F.3d 678, 696 (2d Cir. 2011) ("[J]udicial estoppel may only apply where the earlier tribunal accepted the accuracy of the litigant's statements.")  Thus, the Court finds that the second factor favors Mr. Emmons.

Finally, the Court agrees with Mr. Emmons that Plaintiff did not explain how estopping Mr. Emmons from asserting a personal jurisdiction defense in this litigation maintains judicial integrity.[11]  (See Emmons Reply at 4.)  This is necessary as the Court of Appeals "limit[s] judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010) (citation and quotations omitted).  As stated above, Mr. Emmons did not seek

_____

[11] Plaintiff only states that allowing Mr. Emmons to proceed "would prejudice Mr. Prince, who acquiesced in Emmons's prior position and proceeded as the Wyoming Court anticipated by refiling in New York." (Pl. Br. at 7.)  However, it was Plaintiff who originally sought to transfer venue to this district. (See Brown Decl., Ex. 15 at 7-8 ("If the Court denies jurisdictional discovery, Mr. Prince requests a transfer to the Southern District of New York . . . .").)

to transfer venue,[12] and the Wyoming court did not grant
Plaintiff's request to transfer venue.  Thus, the Court finds
that the final factor favors Mr. Emmons.

Accordingly, after considering each factor, the Court
rejects Plaintiff's argument that Mr. Emmons is judicially
estopped from challenging the Court's jurisdiction over him.

### ii. General Jurisdiction

Turning to general jurisdiction first, "[f]or an
individual, the paradigm forum for the exercise of general
jurisdiction is the individual's domicile." Goodyear Dunlop
Tires Operations, S.A. v. Brown, 564 U.S. 915, 924 (2011);
Daimler AG v. Bauman, 571 U.S. 117, 137 (2014).  During
Mr. Emmons's employment at First Look, he resided in Washington,
D.C. and Virginia.  (See Emmons Decl. ¶ 4.)  In June 2021, upon
resigning from First Look, Mr. Emmons moved from Washington,
D.C. to Connecticut where he currently resides.  (See id. ¶ 12.)
Personal jurisdiction is determined at the time of service of
the summons and complaint.  See Darby v. Compagnie Nat. Air
France, 735 F. Supp. 555, 560 (S.D.N.Y. 1990).  Because New York
was not Mr. Emmons's domicile as a First Look employee or at the

---

[12] (See id., Ex. 15 at 20 n.8 (noting that despite Mr. Emmons's
failure to respond to Plaintiff's argument to transfer the case
to the Southern District of New York, the Wyoming court had to
determine if transfer was warranted).)

time Plaintiff filed the Complaint,[13] the Court finds that
Mr. Emmons is not subject to the Court's general jurisdiction.

### iii. Specific Jurisdiction

In a diversity action, personal jurisdiction of a federal
court over a non-resident defendant is governed by the law of
the state in which the court sits and by the limits of due
process.  See Goldfarb v. Channel One Russia, 442 F. Supp. 3d
649, 662 (S.D.N.Y. 2020), reconsideration denied, 18 Civ. 8128,
2021 WL 1392850 (S.D.N.Y. Apr. 13, 2021).  First, the Court
looks to New York's jurisdictional statute, which is section
302(a) of the New York Civil Practice Law & Rules ("CPLR").  If
jurisdiction is appropriate under New York's long-arm statute,
then the Court determines whether such exercise comports with
due process.

Plaintiff argues that section 302(a)(1) of the CPLR
("Section 302(a)(1)") provides a basis for the Court to assert
specific jurisdiction.[14]  Section 302(a)(1) provides that "a
court may exercise personal jurisdiction over any non-
domiciliary . . . , who in person or through an agent . . .

---

[13] Plaintiff did not oppose Mr. Emmons's argument that he is not
subject to the Court's general jurisdiction.
[14] Sections 302(a)(2) and (3) "exempt causes of action for the
tort of defamation from their scope, whether or not such
jurisdiction would be consistent with due process protection."
Best Van Lines, Inc. v. Walker, 490 F.3d 239, 244-45 (2d Cir.
2007).

transacts any business within the state." N.Y. CPLR 302(a)(1).
Specific jurisdiction over a non-domiciliary also requires that
the cause of action arise out of the business transaction within
the state. See Biro v. Conde Nast, No. 11 Civ. 4442, 2012 WL
3262770, at *9 (S.D.N.Y. Aug. 10, 2012). Thus, "[t]o determine
the existence of jurisdiction under [S]ection 302(a)(1), a court
must decide (1) whether the defendant transacts any business in
New York and, if so, (2) whether this cause of action arises
from such a business transaction." Best Van Lines, 490 F.3d at
246 (internal quotations omitted).

### 1. Transacting Business in New York

"[T]o demonstrate that an individual is transacting
business within the meaning of Section 302(a)(1), there must
have been some 'purposeful activities' within the State that
would justify bringing the nondomiciliary defendant before the
New York courts." Vuzix Corp. v. Pearson, No. 19 Civ. 689,
2019 WL 5865342, at *3 (S.D.N.Y. Nov. 6, 2019) (quoting SPCA of
Upstate New York, Inc. v. Am. Working Collie Ass'n, 963 N.E.2d
1226, 1228 (N.Y. 2012)). "Courts look to 'the totality of the
defendant's activities within the forum' to determine whether a
defendant has 'transact[ed] business' in such a way that it
constitutes 'purposeful activity' satisfying the first part of
the test." Best Van Lines, Inc., 490 F.3d at 246 (cleaned up).

However, New York courts construe "transacts any business within the state" in Section 302(a)(1) "more narrowly in defamation cases than they do in the context of other sorts of litigation." Id. at 248.  The Court of Appeals has clarified that "the 'single act' of uttering a defamation, no matter how loudly, is not a 'transact[ion of] business' that may provide the foundation for personal jurisdiction."[15] Id. (noting that "when the defamatory publication itself constitutes the alleged 'transact[ion of] business' for the purposes of section 302(a)(1), more than the distribution of a libelous statement must be made within the state to establish long-arm jurisdiction over the person distributing it" (citation omitted)).  Thus, New York courts exercise personal jurisdiction where the defendant's "out-of-state conduct involved defamatory statements projected into New York, 'but only where the conduct also included something more.'" Goldfarb, 442 F. Supp at 662 (quoting Best Van Lines, 490 F.3d at 249); see also Giannetta v. Johnson, 20 Civ. 9016, 2021 WL 2593305, at *8 (S.D.N.Y. June 24, 2021) ("New York courts have found that they lacked jurisdiction over out-of-state defendants accused of having uttered defamatory

---

[15] In Best Van Lines, the Court of Appeals addressed long-arm jurisdiction for internet-based defamation holding that "the posting of defamatory material on a website accessible in New York does not, without more, constitute transacting business in New York for purposes of New York's long-arm statute." Best Van Lines, 490 F.3d at 250 (cleaned up).

falsehoods where the defamation claim did not arise from the defendants' specific business transactions in New York." (internal quotations omitted)).

The "something more" standard is satisfied "when at least part of the defamatory content was created, researched, written, developed, or produced in New York." Goldfarb, 442 F. Supp at 662; see also Trachtenberg v. Failedmessiah.com, 43 F. Supp. 3d 198, 202 (E.D.N.Y. 2014) ("In cases involving allegedly defamatory content published by an out-of-state media outlet, courts have found transactions only when the content in question was based on research physically conducted in New York."). "Examples of activities that, without more, do not qualify" include "brief visits and phone calls to the state." Giannetta, 2021 WL 2593305, at *8; but see Symmetra Pty. Ltd. v. Human Facets, LLC, 12-CV-8857, 2013 WL 2896876, at *6 (S.D.N.Y. June 13, 2013) (noting that researching a defamatory book or news broadcast in New York satisfies Section 302(a)(1)).

Although Mr. Emmons acknowledges that he had contact with New York during his employment at The Intercept,[16] Plaintiff

---

[16] Mr. Emmons admits that (1) he submitted his work product "on the discrete issue of U.S. sanctions law" for the Article to his "New-York based colleague;" (2) "provid[ed] a read-through of the draft article prior to publication;" and (3) traveled to New York for work, "usually in connection with First Look's annual staff meeting," but not in connection with the Article. (Emmons Decl. ¶¶ 2, 5, 7; Pl. Br. at 8-9.)

failed to satisfy the "something more" standard because
Mr. Emmons's contacts with New York were not related to the
creation of the Article's allegedly defamatory statements.  With
respect to his role in drafting the Article, Mr. Emmons did not
travel to New York to conduct research, interview a source in
New York, or rely on a New York source (Emmons Br. at 8).  Just
as the court in Trachtenberg dismissed the plaintiff's
defamation claim under Section 302(a)(1) because "[b]asing an
article on information received out-of-state from a New York
source is simply not the same as coming to New York to conduct
research," Trachtenberg, 43 F. Supp. at 205, here, the Court
finds that Mr. Emmons's sending his research on U.S. sanction
law—based on "federal government regulations promulgated by
Washington, D.C.-area agencies and by communicating with a
sanctions expert based in the Washington, D.C. area"—to his New
York-based colleague is not sufficient to satisfy the first
prong.  (Emmons Br. at 2.)

The Court agrees with Mr. Emmons that Plaintiff's reliance
on Mercator Risk Services Inc. v. Girden, 08-CV-10795, 2008 WL
5429886 (S.D.N.Y. Dec. 30, 2008) is inapposite because the case
concerns a New York employer suing former employees for
allegedly stealing or revealing the employer's trade secrets.
As stated above, New York courts construe "transacts any
business within the state" in Section 302(a)(1) "more narrowly

in defamation cases than they do in the context of other sorts of litigation." Best Van Lines, 490 F.3d at 248.  Thus, the standard applicable to the exercise of personal jurisdiction in non-defamation cases is not relevant.  Accordingly, the Court finds that Plaintiff does not satisfy the first prong of Section 302(a)(1).

### 2. Arising From a Business Transaction

A cause of action arises from "a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York."  Id. at 246 (quoting Henderson v. INS, 157 F.3d 106, 123 (2d Cir. 1998)).  Under Section 302(a)(1) "even if [the] defendant committed purposeful acts in-state, they must be substantially related to the cause of action" which "[i]n a defamation context,[] means that the allegedly defamatory statements must refer to the jurisdiction-conferring transaction." Trachtenberg, 43 F. Supp. 3d at 204.

Here, there is not a substantial relationship between Mr. Emmons's conduct in New York and Plaintiff's claims.  As stated above, Mr. Emmons did not travel to New York to conduct research, interview any person in New York, or rely on any sources in New York in connection with drafting his portion of the Article.  See Tannerite Sports, LLC v. NBCUniversal Media LLC, 135 F. Supp. 3d 219, 234 (S.D.N.Y. 2015), aff'd on other

grounds sub nom <u>Tannerite Sports, LLC v. NBCUniversal News Grp.</u>,
864 F.3d 236 (2d Cir. 2017) (finding that the plaintiff failed
the second prong of Section 302(a)(1) because the defendant's
employees did not "interview[] any people in New York or rel[y]
on any sources in connection with the creation or broadcast" of
the disputed report).  In fact, Mr. Emmons did not provide any
research or reporting on the allegedly defamatory statements:
Plaintiff's alleged meeting with and proposal to the Wagner
Group.  (<u>See</u> Pl. Br. at 4.)

Because Plaintiff has not satisfied either prong of
Section 302(a)(1), New York courts do not have jurisdiction over
this defamation claim against Mr. Emmons.  As such, the Court
need not, and does not, consider whether exercising jurisdiction
would violate Mr. Emmons's due process rights.  <u>See</u> <u>Whitaker v.</u>
<u>Am. Telecasting, Inc.</u>, 261 F.3d 196, 208 (2d Cir. 2001).

Having concluded that the Court lacks personal jurisdiction
over Mr. Emmons, Mr. Emmons's motion to dismiss pursuant to
Federal Rule of Civil Procedure 12(b)(2) for lack of personal
jurisdiction under Section 302(a)(1) is granted.

### b. Defamation

"Defamation is the injury to one's reputation either by
written expression, which is libel, or by oral expression, which
is slander."  <u>Biro I</u>, 883 F. Supp. 2d at 456; <u>see also</u> <u>Albert v.</u>
<u>Loksen</u>, 239 F.3d 256, 265 (2d Cir. 2001).  To prove a claim for

defamation, a plaintiff must show: (1) "a false statement," (2) "published without privilege or authorization to a third party," (3) "constituting fault as judged by, at a minimum, a negligence standard," and (4) "either caus[ing] special harm or constitut[ing] defamation per se."[17]  Watson v. NY Doe 1, 439 F. Supp. 3d 152, 160 (S.D.N.Y. 2020); see also Tannerite Sports, LLC, 864 F.3d at 244.

Defendants[18] contend that Plaintiff's defamation claim warrants dismissal for several reasons.  Specifically, the First Look Defendants argue that (1) Plaintiff was required to but failed to plead actual malice and (2) that its statements are non-actionable opinion based on disclosed facts.  (See generally, First Look Br. at 8-19.)

    i. Choice-of-Law

Before addressing the First Look Defendants' arguments, the Court must first determine which body of substantive law

---

[17] To state a libel claim under New York law, a plaintiff must allege: "1) a written defamatory statement of fact concerning the plaintiff; 2) publication to a third party; 3) fault either negligence or actual malice depending on the status of the libeled party; 4) falsity of the defamatory statement; and 5) special damages or per se actionability."  Palin v. N.Y. Times Co., 482 F. Supp. 3d 208, 214 (S.D.N.Y. 2020), modified, 510 F. Supp. 3d 21 (S.D.N.Y. 2020); see also Palin, 940 F.3d at 809.
[18] Mr. Emmons joins the First Look Defendants in arguing that the Complaint fails to state a viable claim for defamation.  (See Emmons Br. at 11-12.)  However, because the Court held that it lacks personal jurisdiction over Mr. Emmons, the Court only addresses the First Look Defendants' arguments in support of dismissing the Complaint under Rule 12(b)(6).

applies: New York or Wyoming.  "A federal court sitting in diversity applies the choice-of-law rules of the forum state." Md. Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 151 (2d Cir. 2003) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)).  Because the Court's subject matter jurisdiction in this case rests on diversity of citizenship, (see Compl. ¶ 17), the Court applies New York choice-of-law rules to determine which body of substantive law applies.

Under New York choice-of-law rules, "the first step in any choice of law inquiry is to determine whether there is an 'actual conflict'" between the rules of the relevant jurisdictions.  Booking v. Gen. Start Mgmt. Co., 254 F.3d 414, 419-20 (2d Cir. 2001) (citation omitted).  Although the defamation laws of Wyoming and New York substantially overlap, the First Look Defendants move to dismiss under New York's anti-SLAPP statute, New York Civil Rights Law § 76-a, which, unlike Wyoming, requires a plaintiff to prove actual malice[19] to

---

[19] The New York anti-SLAPP statute requires that "[i]n an action involving public petition and participation" a plaintiff must establish by clear and convincing evidence that the statement that gave "rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a(2); see also Sweigert v. Goodman, 1:18-CV-08653, 2021 WL 1578097 (S.D.N.Y. Apr. 22, 2021) (noting that the amendments to New York's anti-SLAPP law in 2020 "expanded the definition of an 'action involving public petition and participation' and, thus, 'substantially broadened the reach of the actual malice rule'" (citation omitted)).

establish a claim for defamation.  Accordingly, the Court finds

that an actual conflict exists and must decide which state's

substantive law controls.

In tort cases such as this one, New York "applies the law

of the state with the most significant interest in the

litigation."  Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d

Cir. 1999) (citing Padula v. Lilarn Props. Corp., 84 N.Y.2d 519,

521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994)); see also Kinsey

v. N.Y. Times Co., 991 F.3d 171, 176 (2d Cir. 2021).  In

weighing the jurisdictional interests, courts distinguish

between "conduct-regulating" and "loss-allocating" rules.

Kinsey, 991 F.3d at 176 (citation omitted).  It is well

established that "a rule that governs defamatory or libelous

conduct can be considered conduct-regulating," and thus New York

courts usually apply the law of the jurisdiction with the more

significant relationship to the parties and the tort.  Id.

(citation omitted).  "Under New York choice-of-law rules in

defamation cases the state of the plaintiff's domicile will

usually have the most significant relationship to the case, and

its law will therefore govern."  Lee, 166 F.3d at 545 (internal

quotation marks omitted).  However, this consideration is not

conclusive.

In multistate defamation cases, though, "the state with the

most significant relationship is not necessarily readily

apparent.  Thus, in cases where an allegedly defamatory statement is published nationally, there is only a presumptive rule that the law of [the] plaintiff's domicile applies, which does not hold true . . . if with respect to the particular issue, some other state has a more significant relationship to the issue or the parties." Catalanello v. Kramer, 18 F. Supp. 3d 504, 512 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).  Here, it is undisputed that The Intercept is a national publication with a national distribution.  (See First Look Reply at 2; see also Pl. Br. at 14 (noting that "The Intercept is an online-only news publication that covers issues of national and international importance[] [and] its readers are people from all over the country and world, and it does not target persons from any single state . . ." (cleaned up)).) Because The Intercept published the allegedly defamatory statements nationally, the Court first determines whether there is a basis to conclude that New York has a more significant

relationship to the issue or the parties than the state of
Plaintiff's domicile.[20]

"In considering whether another jurisdiction . . . has a
more significant relationship to the case, New York courts will
'weigh all the factors that might impact on the interests of
various states in the litigation . . . includ[ing,] where [the]
plaintiff suffered the greatest injury; [from] where the
statements emanated and were broadcast; where the activities to
which the allegedly defamatory statements refer took place; and
the policy interests of the states whose law might apply.'"
Kinsey, 991 F.3d at 177 (quoting Condit v. Dunne, 317 F. Supp.
2d 344, 353-54 (S.D.N.Y. 2004)).[21]

Applying these factors and accepting Plaintiff's factual
allegations as true, Plaintiff has established that he is

---

[20] Plaintiff's analysis of Kinsey in support of its opposition to
finding that New York has a more significant interest in the
litigation than Wyoming is unavailing. (See Pl. Br. at 14.)  It
makes no difference that The Intercept, unlike The New York
Times, is not distributed in print to New Yorkers or contains a
New York-specific section.  As articulated in Kinsey, when a
media defendant is a national publication with a national
distribution, courts analyze which state had the most
significant relationship.  Kinsey, 991 F.3d at 177.
[21] "There is a nine-factor test that has been employed by some
district courts in this Circuit to decide which state's law
governs a defamation claim in cases of multi-state publication
of defamatory material.  However, this nine-factor test has not
been adopted explicitly by the Court of Appeals as reflecting
New York law, and other district courts have noted that it has
not found favorable use among recent New York decisions."
Merrill Lynch, Pierce, Fenner & Smith Inc. v. Savino,
No. 06-CV-868, 2007 WL 895767, at *7 (S.D.N.Y. Mar. 23, 2007).

domiciled in Wyoming.  (See Compl. ¶ 11.)  As pleaded, however, the injury is not limited to Wyoming, as Plaintiff alleges that the "broad dissemination of the [Article] across many media and social media platforms has further harmed Mr. Prince's personal and professional reputation." (Id. ¶ 65; see also Pl. Br. at 15.)  This factor, therefore, weighs only slightly in favor of applying Wyoming law.

Second, the First Look Defendants are domiciled in New York;[22] Mr. Cole is a New York resident and The Intercept, "owned by First Look Media Works, Inc.," is a "New York company with its principal place of business in New York."  (Compl. ¶¶ 12-14.)  The Article emanated from New York because Mr. Cole, as alleged by Plaintiff, "worked with editors and other Intercept staff located in New York in the process of authoring the [Article]," (id. ¶ 19), which First Look published from its New York headquarters (see First Look Br. at 8 n.4).  Moreover, the Article was published on the internet, and, as Plaintiff alleges, "news outlets throughout the world republished or cited" the Article.  (Compl. ¶ 54.)  Therefore, this factor weighs in favor of applying New York law.

---

[22] See Dargahi v. Hymas, No. 05-CV-8500, 2008 WL 8586675, at *5 (S.D.N.Y. Oct. 15, 2008) ("Under New York law, the domicile of a corporation for choice-of-law purposes is the State where it maintains its principal place of business." (internal quotation marks omitted)).

Third, the activities to which the allegedly defamatory
statements refer—whether Plaintiff met with the Wagner Group
and proposed his services—are global and affect both Wyoming and
New York from a national security perspective.  Thus, this
factor does not favor application of either Wyoming's or New
York's law.

Finally, while Wyoming has an interest in protecting its
citizens from defamation, "New York has strong policy interests
in regulating the conduct of its citizens and its media."
Kinsey, 991 F.3d at 177; see also Condit, 317 F. Supp. 2d at 353
(noting that New York's interest in regulating the conduct of
its media "remains even when the target of the statement lives
in another state").  As stated above, the First Look Defendants
are domiciled in New York.  Accordingly, the Court follows the
Court of Appeals' reasoning in Kinsey "in finding that this
factor weighs in favor of applying New York law to [media]
outlets that operate out of New York."  Deluliis v. Engel, No.
20-CV-3252, 2021 WL 4443145, at *10 (S.D.N.Y. Sept. 27, 2021).

Considering each of the Kinsey factors, including that
Plaintiff sued in New York because the Wyoming Action was
dismissed for lack of personal jurisdiction, (see First Look Br.
at 6), the Court finds that New York has a more significant
interest in this litigation than Wyoming.  The Court notes that
unlike in Deluliis, Plaintiff did not allege "some harm that has

27

a specific nexus to New York." Deluliss, 2021 WL 4443145, at *10.  However, this omission does not alter the Court's conclusion because the Complaint does not allege a specific nexus to any location; rather, Plaintiff alleges that he suffered global harm, e.g., "interference with and damage to Mr. Prince's relationships with contractual partners, bankers, lenders, and the media; loss of market share, business opportunities, and access to markets and investors worldwide." (See Compl. ¶ 75.)  Accordingly, that factor does not favor application of either Wyoming's or New York's law.  Thus, the Court evaluates the First Look Defendants' motion under New York law.

### c. Fault

#### i. Public Figure

"The showing of fault necessary to recover for libel varies depending on a plaintiff's position in society, requiring a higher degree of fault for public officials and public figures." Celle v. Filipino Rep. Enters. Inc., 209 F.3d 163, 176 (2d Cir. 2000).  A plaintiff who is a public figure must plausibly allege that the defendant made the statements with actual malice.  See Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir. 2015) (citations omitted).

"Whether or not a person . . . is a public figure is a question of law for the court to decide."  Church of Scientology

Int'l v. Eli Lilly & Co., 778 F. Supp. 661, 666 n.3 (S.D.N.Y. 1991) (citations omitted).  The Supreme Court has recognized that a plaintiff is a public figure if he or she either: (1) achieves "such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts[,]" or (2) "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."  Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974).  The parties focus on the latter, which is a limited-purpose public figure.

    As an initial matter, the Court finds Plaintiff's argument that determining Plaintiff's position in society "not suitable for disposition prior to discovery," (see Pl. Br. at 24-26), unavailing.  "Where the question whether a plaintiff is a public figure can be determined based upon the pleadings alone, the Court may deem a plaintiff a public figure at the motion to dismiss stage."  Biro v. Conde Nast (Biro II), 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013), aff'd, 807 F.3d 541 (2d Cir. 2015), and aff'd, 622 F. App'x 67 (2d Cir. 2015).  Here, the First Look Defendants argue that Plaintiff is a limited-purpose public figure and that he must therefore plead actual malice to proceed with his defamation claim.  (See First Look Br. at 14-16.) Thus, the Court must determine whether Plaintiff is a limited-purpose public figure for the purposes of this action or at

least whether such a determination can be made at the pleadings stage in this litigation.

The Court of Appeals established a four-part test to determine whether a plaintiff is a limited-purpose public figure.  A defendant must show that a plaintiff has:

> (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

Biro II, 963 F. Supp. 2d at 270 (quoting Lerman v. Flynt Distrib. Co., Inc., 745 F.2d 123, 136-37 (2d Cir. 1984)).  "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention."  Gottwald v. Sebert, 148 N.Y.S.3d 37, 44 (App. Div. 2021) (quoting Wolston v. Reader's Digest Assn. Inc., 443 U.S. 157, 167 (1979)).

"By definition, comments regarding a limited purpose public figure are subject to heightened scrutiny only to the extent that they are relevant to the public figure's involvement in a given controversy."  Biro II, 963 F. Supp. 2d at 270-71.  However, "once a plaintiff is deemed a limited purpose public figure, courts allow the heightened protections to sweep broadly, covering all statements by defendants that are not

30

'wholly unrelated to the controversy.'"  Id. (quoting Waldbaum
v. Fairchild Publ'ns, Inc., 627 F.2d 1287, 1298 (D.C. Cir.
1980)).

### 1. Successful Invitation of Public Attention to Influence Others

In determining whether Plaintiff is a limited-purpose
public figure, the Court first examines whether he took
affirmative steps to attract personal attention or public
acclaim.  Plaintiff admits that from 1997 to 2010, he founded
and ran Blackwater, which "won numerous U.S. government
contracts, such as providing support for government agencies in
the aftermath of the bombing of the U.S.S. Cole in Yemen,
assisting in the hunt for Osama Bin Laden following the
September 11, 20021 attacks, [and] providing support and
training in Iraq and Afghanistan."  (Compl. ¶¶ 11, 22.)  He is
also "[E]xecutive Director and Vice Chairman of Frontier
Services Group ["FSG"], a leading provider of integrated
security, logistics, insurance and infrastructure services for
clients operating in frontier markets."  (Id. ¶¶ 11, 22.)
Moreover, Plaintiff has authored articles, (see Brown Decl.,
Exs. 27-28 (opinion articles by Plaintiff proposing to use
private military contractors to train and patrol alongside
Afghan security forces)), and given interviews in various
publications on using private military contractors in foreign

31

conflicts (see Brown Decl. Exs. 24-26).[23]  Although Plaintiff
does not address whether he invited public attention to
influence others, the Court adopts the Biro II court's rationale
that the "very purpose of writing articles . . . and opining in
news shows and documentaries is to influence public discourse."
Biro II, 963 F. Supp. 2d at 271.  As in Biro II, here, Prince's
articles evince a desire to influence public discourse about
using private military contractor in foreign conflicts.  (See,
e.g., Brown Decl. Ex. 28 ("Erik Prince: Contractors, Not Troops,
Will Save Afghanistan").)  Accordingly, the Court finds that the
First Look Defendants satisfy the first prong of Lerman.

---

[23] Plaintiff's argument that the Court cannot determine
Mr. Prince's status as a limited-purpose public figure because
Defendants included "articles and other media surrounding
Mr. Prince, rather than relying on the allegations in the
Complaint" is unavailing.  (See Pl. Br. at 25.)  As stated in
Biro II, a court may "take judicial notice of the existence of
articles written by and about [plaintiff], though not for the
truth of the matter asserted in the documents themselves.
Courts in this Circuit have employed judicial notice in making
determinations about whether plaintiffs are public figures at
the motion to dismiss stage."  Biro II, 963 F. Supp. 2d at 271
n.9.  Here, as in Biro II, in taking judicial notice of articles
written by or about Plaintiff that were attached to a
declaration submitted by the First Look Defendants, the Court
looks only to what statements the documents contain—not for the
truth of the matter asserted—to evaluate whether Plaintiff is a
limited-purpose public figure.  See also Elliott v. Donegan,
469 F. Supp. 3d 40, 45 n.2 (E.D.N.Y. 2020) (taking "judicial
notice of excerpts of books and articles written by Plaintiff
prior to the alleged defamatory incident that were attached to a
declaration submitted by Defendant" to determine whether the
plaintiff is a limited-purpose public figure).

## 2. Voluntary Injection Into a Controversy

Next, the Court determines whether Plaintiff injected himself into a "public controversy."

### a. Public Controversy

The Court of Appeals has defined a public controversy as "any topic upon which sizeable segments of society have different, strongly held views," even if the topic does not involve "political debate or criticism of public officials." Lerman, 745 F.2d at 138; see also Gottwald, 148 N.Y.S.3d at 44 ("In order to be considered public controversy . . . the subject matter must be more than simply newsworthy . . . it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." (quoting Krauss v. Globe Intern., Inc., 674 N.Y.S.2d 662, 664 (App. Div. 1998)). However, "the issue into which the plaintiff has injected himself must be 'controversial' at the time the plaintiff forayed into the matter." Biro II, 963 F. Supp. 2d at 272; see also Elliott, 469 F. Supp. 3d at 50 ("A controversy is a specific question or real issue being discussed at the time of the defamatory statement.").

The parties dispute the contours of the controversy. Plaintiff contends that he is not a limited-purpose public figure because "the controversy giving rise to the defamation is a controversy of Defendants' own making: Mr. Prince's alleged

efforts to sell military services to sanctioned Russian mercenaries." (Pl. Br. at 26.) However, the scope of a public controversy is not limited to the debate in the alleged defamatory document. "A controversy is broader than only the statement or discussion contained in the allegedly defamatory document." Elliott, 469 F. Supp. 3d at 50 (citing Jankovic v. Int'l Crisis Grp., 822 F.3d 576 (D.C. Cir. 2016)); see also Jankovic, 822 F.3d at 586 ("When defining the relevant controversy, a court may find that there are multiple potential controversies, and it is often true that 'a narrow controversy may be a phase of another, broader one.'" (citation omitted)). Thus, the Court rejects Plaintiff's assertion that the Article created or defined the controversy. (See Pl. Br. at 26.)

Around the time of the defamatory statement—April 13, 2020— the Court finds that the topic of using private military contractors in foreign conflicts was not simply newsworthy; rather, there was a real dispute over whether governments should

use private military contractors in foreign conflicts.[24]   (See
Brown Decl. Ex. 23 (published Feb. 9, 2019, noting reports that
Plaintiff pitched paramilitary services in Libya in 2016, which
FSG denied any involvement in); Brown Decl. Ex. 24 (published
April 3, 2019, discussing Plaintiff's proposal to use private
military contractors in Afghanistan).)

In defining the contours of the controversy, the Court
rejects both Plaintiff's and the First Look Defendants'
definitions.   The Court agrees with Plaintiff that the
defamation at issue does not arise from the First Look
Defendants' first definition of the controversy: the Article is
not about "the use of military contractors overseas by the U.S.
government."   (First Look Br. at 15; Pl. Br. at 27.)   However,
the Court does not limit the controversy to the U.S.
government's using private military contractors; there is a
public debate over the use of private military contractors or

---

[24] The Court reiterates that it takes judicial notice of the
existence of articles written by and about Plaintiff for
purposes of establishing when the articles were published and
what was reported, not for the truth of the matter asserted.
See Brimelow v. N.Y. Times, No. 20 CIV. 222 (KPF), 2020 WL
7405261, at *1 n.1 (S.D.N.Y. Dec. 16, 2020), aff'd, No. 21-66-
CV, 2021 WL 4901969 (2d Cir. Oct. 21, 2021), cert. denied sub
nom. Brimelow v. N.Y. Times, 212 L. Ed. 2d 217, 142 S. Ct. 1210
(2022) (taking judicial notice of the plaintiff's published
writings because "(1) the truth of the statements is not at
issue; (ii) Plaintiff does not deny that he made the statements;
(iii) there was undisputed notice to Plaintiff of their
contents; and (iv) they are integral to Plaintiff's claims").

paramilitary services by countries other than the United States in foreign conflicts.  (See Brown Decl. Ex. 23 at 3.)  Moreover, the Court does not limit the controversy's scope to the First Look Defendants' second definition—"how [Plaintiff's] security expertise is being sold on the open marketplace, including to countries who compete with or are even hostile to U.S. interests," (First Look Br. at 15), because the controversy is not limited to Plaintiff's companies.  (See Brown Decl. Ex. 28 at 4 (Plaintiff's advocating for President Trump to use a private company—"mine or anyone else's"—to provide military contractors in Afghanistan).)  Although Plaintiff's companies are the market leaders, the controversy concerns the concept of governments' employing private military contractors in foreign conflicts.

b. Voluntary Injection into that Controversy

An individual "can become a limited purpose public figure only through his own actions; by 'enter[ing] voluntarily into one of the submarkets of ideas and opinions,' one consent[s] . . . to the rough competition of the marketplace."  Biro II, 963 F. Supp. 2d at 274 (citing Dilworth v. Dudley, 75 F.3d 307, 309 (7th Cir. 1996)).  As discussed above, Plaintiff has written opinion articles and given interviews in various publications on using private military contractors in foreign conflicts, which

36

shows that Plaintiff has participated in the debate on this issue.[25]  Contra Elliott, 469 F. Supp. 3d at 54 (the plaintiff is not a limited-purpose public figure because the plaintiff's involvement in "a controversy surrounding sexual assault, sexual harassment and consent in the workplace" was limited "to only a few tangential references to sexual harassment or lewd jokes in the workplace in [the] [p]laintiff's writing and interviews").  Accordingly, the Court finds that the First Look Defendants satisfy the second prong of Lerman.

### 3. Assumption of Prominent Position in the Controversy

The "degree of voluntar[y] involvement in the public controversy" is important in determining whether the plaintiff is a limited purpose public figure.  Chandok v. Klessig, 648 F. Supp. 2d 449, 458 (N.D.N.Y. 2009) (citation omitted), aff'd, 632 F.3d 803 (2d Cir. 2011).  A "trivial or tangential" role in the controversy is not sufficient to be a limited-purpose public figure because the First Look Defendants easily meet this prong of Lerman.  See Biro II, 963 F. Supp. 2d at 275 (citation

---

[25] Plaintiff claims that "[a]t the time the [Article] was published, . . . [h]e had never written, given an interview, or otherwise spoken publicly about selling military contractor services to Russia or the United States' sanctions on Russian mercenaries including, but not limited to, the Wagner Group." (Compl. ¶ 53.)  For the reasons stated above, the Court defines the controversy as broader than the topic of the alleged defamatory document.

omitted).  Plaintiff is well known for founding Blackwater—which
provided military contractors in Afghanistan—and advising
President Trump on military and foreign policy issues in Africa,
the Middle East, and Afghanistan.  (See Brown Decl. Ex. 1 at 4.)

### 4. Regular and Continuing Access to Media

Finally, the record before the Court on this motion
indicates that Plaintiff had regular and continuing access to
the media: Plaintiff not only published opinion articles in
major newspapers (the Wall Street Journal and The New York
Times) twice in 2017 (see id. Exs. 27, 28), but also is sought
out for interviews on using private military contractors in
foreign conflicts (see id. Exs. 24-26).  Because Plaintiff
"enjoy[s] significantly greater access to the channels of
effective communication' than the average person," he has "a
more realistic opportunity to counteract false statements than
private individuals normally enjoy."  Biro II, 963 F. Supp. 2d
at 275 (citation and internal quotation mark omitted).

Because the First Look Defendants meet all four prongs of
the Lerman test, the Court finds that Plaintiff constitutes a
limited-purpose public figure.  Accordingly, to survive
dismissal, Plaintiff must plausibly allege actual malice.

### ii. New York's "anti-SLAPP" Law

The First Look Defendants contend that separate and apart
from whether Plaintiff is a limited-purpose public figure,

38

Plaintiff must plead actual malice under New York's amended anti-SLAPP law.  (See First Look Br. at 13-14.)  New York's anti-SLAPP law has long contained an actual malice requirement "[i]n an action involving public petition and participation." N.Y. Civ. Rights Law § 76-a(2).[26]  However, the prior version of the law limited the actual malice requirement to cases brought by "persons whose proposed actions required government permission."  Chandok, 632 F.3d at 819.  However, on November 10, 2020, New York amended its anti-SLAPP statute broadening actions subject to the actual malice requirement. Under the amended anti-SLAPP law, an "action involving public petition and participation" includes:

> (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or

> (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the constitutional right of petition.

---

[26] New York's amended anti-SLAPP statute is applicable to this action.  It is well established that "a federal court sitting in diversity must apply § 76-a because it is a substantive, rather than a procedural, provision."  Palin, 510 F. Supp. 3d at 26; Coleman v. Grand, 523 F. Supp. 3d 244, 258 (E.D.N.Y. 2021) (noting that federal courts apply § 76-a because it is "'manifestly substantive' governing the merits of libel claims and increasing defendants' speech protections" (citation omitted)).

N.Y. Civ. Rights Law § 76-a(1)(a).  Further, the law states that the term "public interest" is to "be construed broadly, and shall mean any subject other than a purely private matter."  Id. at § 76(1)(d).  Plaintiff does not dispute that the complained of conduct falls under the anti-SLAPP statute; rather, Plaintiff argues that the anti-SLAPP statue is inapplicable because Wyoming law governs this matter.  (See Pl. Br. at 24.)

Given the statute's broad reach for the term "public interest," the Court finds that Plaintiff's argument is without merit.  The Article—which covered issues of national security and international relations, published to a general audience—concerns more than "a purely private matter."  N.Y. Civ. Rights Law § 76-a(1)(d); see also NOVAGOLD Res., Inc. v. J. Cap. Rsch. USA LLC, No. 20-CV-2875, 2022 WL 900604, at *3 (E.D.N.Y. Mar. 28, 2022) (a report criticizing the feasibility and the plaintiff's management of a gold project is matter of "public interest"); Goldman v. Reddington, No. 18-CV-3662, 2021 WL 4099462, at *4 (E.D.N.Y. Sept. 9, 2021) (Facebook and LinkedIn posts accusing the plaintiff of sexual assault is more than a purely private matter).

iii. <u>Actual Malice</u>

Because (1) Plaintiff's defamation claim falls within New York's amended anti-SLAPP law[27] and (2) Plaintiff is a limited-purpose public figure, Plaintiff must plausibly allege that Defendants acted with actual malice[28] to sustain his claim.[29]  He has not done so, and this claim, therefore, must be dismissed.

To survive a motion to dismiss, "malice must be alleged plausibly in accordance with Rule 8."  <u>Biro</u>, 807 F.3d at 545.  Therefore, "a public-figure plaintiff must plead plausible grounds to infer actual malice by alleging enough facts to raise a reasonable expectation that discovery will reveal evidence of actual malice."  <u>Id.</u> at 546 (cleaned up); <u>see id.</u> at 545-46

---

[27] <u>See Palin</u>, 510 F. Supp. 3d at 26 ("It is undisputed that § 76-a requires public figures . . . to prove actual malice by clear and convincing evidence.").

[28] "Limited-purpose public figures who seek damages for defamatory statements must show that the statements were made with 'actual malice'—that is, with knowledge that the statements were false or [made] with reckless disregard as to their falsity."  <u>Biro</u>, 807 F.3d 541 at 544; <u>see also</u> <u>McDougal v. Fox News Network, LLC</u>, 489 F. Supp. 3d 174, 185 (S.D.N.Y. 2020).  The Supreme Court has clarified that although "the concept of 'reckless disregard' cannot be fully encompassed in one infallible definition, . . . the defendant must have made the false publication with a high degree of awareness of . . . probable falsity, or must have entertained serious doubts as to the truth of his publication."  <u>Harte-Hanks Commc'ns, Inc. v. Connaughton</u>, 491 U.S. 657, 667 (1989) (internal quotation marks, citations, and alterations omitted); <u>see also</u> <u>Albert</u>, 239 F.3d at 272.

[29] <u>See</u> <u>Biro II</u>, 963 F. Supp. 2d at 276 (noting that to prevail on a defamation claim, a public figure plaintiff "must demonstrate by clear and convincing evidence that the defendant acted with 'actual malice'").

(noting that courts in this Circuit "have inferred actual malice at the pleading stage").

Here, Plaintiff's allegations of actual malice are to the effect that Defendants (1) relied entirely on anonymous sources; (2) failed to include information regarding their anonymous sources in violation of The Intercept's policies and procedures; (3) deliberately avoided the truth because Plaintiff's counsel denied Defendants' allegations, and Defendants refused to engage with Plaintiff by providing additional details regarding their allegations; and (4) harbored a political bias against Plaintiff. (See Compl. ¶¶ 42, 43; Pl. Br. at 28-33.)

Biro is instructive to show why Plaintiff's allegations do not support a plausible inference of actual malice. The Biro court established that "reliance on anonymous or unreliable sources without further investigation may support an inference of actual malice." Biro, 807 F.3d at 546. However, a plaintiff's allegations must be nonconclusory because "[f]ailure to investigate does not in itself establish bad faith." Id. (quoting St. Amant v. Thompson, 390 U.S. 727, 733 (1968)); see also McDougal, 489 F. Supp. 3d at 185. Here, Plaintiff's attempt to provide additional allegations fails.

First, as in Biro, Plaintiff does not "allege facts that would have prompted [Defendants] to question the reliability of any of the named or unnamed sources at the time the Article was

42

published." Biro, 807 F.3d at 546; see also Brimelow v. N.Y.
Times, No. 21-66-cv, 2021 WL 4901969, at *3 (2d Cir. Oct. 21,
2021), cert. denied sub nom. Brimelow v. N.Y. Times, 142 S. Ct.
1210 (2022) (the plaintiff failed plausibly to allege actual
malice because the complaint "provide[d] no basis for plausibly
inferring that the [defendant] had any doubts about the truth of
its statements regarding [the plaintiff]"). Here, Plaintiff has
not pled that Defendants possessed evidence that their reporting
was in error, which Defendants ignored. Rather, Plaintiff makes
conclusory allegations including whether "such sources even
actually exist" without alleging facts supporting these claims.
(Compl. ¶ 42.) It also appears that—contrary to Plaintiff's
allegation—Defendants substantiated some of these claims.[30]
Defendants' purported violation of The Intercept's policies and
procedures is similarly unavailing. Plaintiff has not alleged
facts to show that Defendants could "establish the credibility
of anonymously sourced information without compromising the
source." (Id. ¶ 43.) Moreover, courts have found that

---

[30] The Court notes that the seventh challenged statement in the
Complaint—that "[a]fter Wagner lost more than a dozen fighters
in Mozambique, Prince sent a proposal to the Russian firm
offering to supply a ground force as well as aviation-based
surveillance," (see Compl. ¶ 78; Pl. Br. at 4)—was "according to
documents viewed by The Intercept and a person familiar to
Prince's proposal." (Brown Decl., Ex. 1 at 7 (emphasis added).)
Thus, not all the challenged statements were based solely on
information from anonymous sources.

"purported deviations from [] normal operating procedures . . . do[] not amount to 'purposeful avoidance of the truth.'" Jankovic, 822 F.3d at 595 (citing Harte-Hanks Commc'ns, Inc., 491 U.S. at 692); see also id. at 665 (finding that a "public figure plaintiff must prove more than an extreme departure from professional standards" to establish actual malice).

Second, despite drawing inferences in Plaintiff's favor, the Court finds Plaintiff's general contention—that as "a former Navy SEAL who earned the trust and confidences of multiple U.S. Presidents" it is "inherently improbable" that he would offer military services to a sanctioned Russian entity—to be conclusory. (Pl. Br. at 29.) The Court agrees with Defendants that Plaintiff's professional background does not make the Article's allegations "inherently improbable" because it would not be a contradiction for Defendants' allegations to be true. (See First Look Reply at 9-10.)

Third, Plaintiff maintains that he sufficiently plead actual malice because Defendants harbor bias against him due to his political views and support of President Trump. (See Compl. ¶¶ 32-34; Pl. Br. at 32.) As support for this claim, Plaintiff cites to articles published by The Intercept about Plaintiff that he claims are inaccurate. (See Compl. ¶¶ 32-34.) However, "allegation[s] about improper political or personal biases do not establish actual malice without additional facts to suggest

the speaker acted pursuant to that bias." McDougal, 489 F.
Supp. 3d at 185.  While Plaintiff admits that bias alone is
insufficient to establish actual malice, he contends that taken
with his other allegations, this raises a plausible inference of
actual malice.  (See Pl. Br. at 32.)

The Court contrasts Plaintiff's position with the
allegations in Palin.  Palin, 940 F.3d at 814.  In Palin, the
Court of Appeals held that actual malice was adequately alleged
because:

> (1) the speaker of defamatory statements
> possessed an editorial and political advocacy
> background sufficient to suggest he published
> the statements with deliberate or reckless
> disregard for their truth, (2) the drafting
> and editorial process of the statements in
> question permitted an inference of deliberate
> or reckless falsification, and (3) the
> newspaper's subsequent correction to the
> allegedly defamatory article did not undermine
> the plausibility of that inference.

McDougal, 489 F. Supp. 3d at 186 (discussing Palin, 940 F.3d at
813-15).  Unlike in Palin, Plaintiff's allegations regarding
bias are speculation supported by conclusory statements because
the Court cannot determine from Plaintiff's selected headlines,
(see Compl. ¶¶ 7, 34), whether The Intercept published false
information in furtherance of a political agenda.  Nor has
Plaintiff alleged specific facts bearing on Mr. Cole's or
Mr. Emmons's knowledge or motives to act based on a personal
bias.  Moreover, there are no allegations regarding the drafting

or editorial process of the allegedly defamatory statements that would render plausible a claim of actual malice.

Finally, Plaintiff alleges that Defendants published the Article with actual malice because "Plaintiff told the Defendants that their reporting was false, [and that] the Defendants . . . refus[ed] to engage with Plaintiff." (Compl. ¶ 43.)  It is well established that denials without more are insufficient to support a plausible claim of actual malice.  See Edwards v. Nat'l Audubon Soc'y, Inc., 556 F.2d 113, 121 (2d Cir. 1997) (stating that actual malice "cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error"); see also Brimelow, 2021 WL 4901969, at *3.  Plaintiff contends that he does not rely on his denial alone to plead actual malice; rather, it is part of the totality of evidence.  (See Pl. Br. at 31 n.13.)  However, the Article reported Plaintiff's denial of the allegations.  (Brown Decl., Ex. 1 at 2.)

In considering the totality of the evidence, the Court finds that Plaintiff's nonconclusory allegations against Defendants do not raise a plausible inference of actual malice. Accordingly, Plaintiff has failed to state a claim on which relief can be granted.

46

### d. False Statement

For the reasons discussed above, the Court concludes that the Complaint has failed to state a claim because it does not plausibly allege that Defendants acted with actual malice. Accordingly, the Court need not analyze whether Plaintiff adequately plead the element of a false statement because Plaintiff did not plausibly allege all the elements for a defamation claim under New York law to survive a motion to dismiss. See Brimelow, 2021 WL 4901969, at *1.

### e. Attorneys' Fees

Given that the Court dismisses the Complaint, Defendants contend that they are entitled to costs and attorneys' fees under New York's anti-SLAPP statute. (See First Look Br. at 19-20; Emmons Br. at 12-13.) In November 2020, New York amended its existing anti-SLAPP statute "to expand protections for defendants facing meritless lawsuits, including mandatory shifting of attorneys' fees." Lindell v. Mail Media Inc., 575 F. Supp. 3d 479, 489 (S.D.N.Y. 2021); see also N.Y. Civ. Rights Law § 70-a. Section 70-a of New York's amended anti-SLAPP statute allows a defendant to recover "damages, including costs and attorney's fees," by bringing a motion to dismiss pursuant to CPLR 3211(g), which "shall be granted" unless the plaintiff demonstrates that the cause of action had a

"substantial basis in fact and law."  N.Y. Civ. Rights Law
§ 70-a (citing N.Y. CPLR 3221(g)).

Plaintiff opposes Defendants' position, arguing that § 70-a
does not apply in federal court.  (See Pl. Br. at 34-35.)  The
Court agrees.  Courts in this district have held that "§ 70-a is
inapplicable in federal court" because its "'substantial basis'
standard articulated in New York's anti-SLAPP law [] conflicts
with the standards under Federal Rules of Civil Procedure 12 and
56."  Nat'l Acad. Of Television Arts & Scis., Inc. v. Multimedia
Sys. Design, Inc., 551 F. Supp. 3d 408, 431-32 (S.D.N.Y. 2021);
see also Carroll v. Trump, NO. 20-cv-7311, 2022 WL 748128, at *7
(S.D.N.Y. Mar. 11, 2022); see also Friedman v. Bloomberg, L.P.,
No. 3:15-cv-443, 2022 WL 1004578, at *1 (D. Conn. Apr. 4, 2022)
(denying defendants' motion to amend as futile because the
"substantial basis" standard in New York's anti-SLAPP statute
conflicts with Rule 12 and 56); but see Harris v. Am. Accounting
Ass'n, No. 5:20-cv-01057, 2021 WL 5505515, at *13-14 (N.D.N.Y.
2021) (awarding attorneys' fees under § 70-a).  The Court agrees
with its colleagues that § 70-a's standard conflicts with the
standards under Federal Rules 12 and 56.  Accordingly,
Defendants' request for costs and attorneys' fees is denied.

### f. Leave to Amend

Based on Plaintiff's failure to make out a prima facie case
for personal jurisdiction over Mr. Emmons, it would be futile to

permit Plaintiff to further amend his Complaint against Mr. Emmons because he cannot offer additional substantive information to cure the deficiencies.[31]  However, the Court grants Plaintiff's request for leave to amend his Complaint against the First Look Defendants because Plaintiff may offer additional information plausibly to plead actual malice.  (See Pl. Br. at 35.)  Accordingly, Plaintiff's request for leave to amend pursuant to Federal Rule of Civil Procedure 15(a)[32] is granted in part and denied in part.

---

[31] "Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend." McCarthy v. Dun & BradStreet Corp., 482 F.3d 184, 200 (2d Cir. 2007).
[32] Rule 15(a) states that, in cases other than amending as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave." F.R.C.P. 15(a).

IV.  **Conclusion**

For the foregoing reasons, Defendant Alex Emmons's motion to dismiss [dkt. no. 21] is <u>GRANTED</u> with prejudice and the First Look Defendants' motion to dismiss [dkt. no. 15] is <u>GRANTED</u> without prejudice.  Plaintiff may file an amended complaint against the First Look Defendants within 30 days of this order. The Clerk of the Court shall close the open motions [dkt. nos. 15, 21].

**SO ORDERED.**

Dated:    October 6, 2022
          New York, New York

LORETTA A. PRESKA
Senior United States District Judge