# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ERIK PRINCE,

                             *Plaintiff*,

        v.

THE INTERCEPT, a New York company, FIRST
LOOK MEDIA WORKS, INC., a Delaware
corporation, and MATTHEW COLE, an individual,

                             *Defendants*.

**CASE NO. 21-cv-10075**

**AMENDED COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff Erik Prince brings this action against The Intercept, First Look Media Works, Inc., and Matthew Cole, (collectively, the "Defendants"). Mr. Prince's allegations are made upon personal knowledge as to himself and his own conduct, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.      The Defendants in this action engaged in a concerted effort to discredit Erik Prince by publishing false or misleading statements about him and his business in The Intercept in order to boost The Intercept's readership, appease its leadership's well-documented dislike of Mr. Prince, gain notoriety, and profit at Mr. Prince's expense.

2.      Although The Intercept's crusade against Mr. Prince has been several years in the making, in 2020, the Intercept stepped up its misinformation campaign by publishing a story about Mr. Prince that was not only entirely fictional, but which also accused Mr. Prince of being a criminal and a traitor.

3.      Despite not having a single source who would go on record, The Intercept published a story on April 13, 2020 titled "*Erik Prince Offered Lethal Services To Sanctioned Russian Mercenary Firm Wagner*" (the "Story").[1] The Story was co-authored by Matthew Cole and Alex Emmons, and included input and oversight by the entire editorial board of The Intercept, including its editor-in-chief, Betsy Reed.

4.      The central premise of the Defendants' Story is the false and defamatory statement that Mr. Prince met, "with a top official of Russia's Wagner Group and offered his

---

[1]      https://theintercept.com/2020/04/13/erik-prince-russia-mercenary-wagner-libya-mozambique/.

mercenary forces to support the firm's operations in Libya and Mozambique." The Story goes on to accuse Mr. Prince of engaging in "illegal" conduct because the alleged solicitations violated the sanctions imposed on the Wagner Group by the Office of Foreign Assets Control ("OFAC") of the U.S. Treasury. In a far cry from journalism, the Story claims the alleged actions taken by Mr. Prince—a former U.S. Navy SEAL Officer and patriot who faithfully served his country for eight years—"threaten democracy."

5.     As the Defendants well know, Mr. Prince never once met with any official from or representative of the Wagner Group. Mr. Prince never offered his services to support the Wagner Group's operations in Libya and Mozambique. Mr. Prince never sent the Wagner Group a proposal to offer his services in Libya and Mozambique. Nor did Mr. Prince ever cause any third party to meet with or submit a proposal to the Wagner Group on his behalf. The factual statements to the contrary in The Intercept's April 13, 2020 Story are false and defamatory. Indeed, prior to publication of the Story, Mr. Prince denounced Russia's involvement in the Libyan civil war, which is matter of public record on which The Intercept itself has reported. The statements in the Story were intended to harm and did harm Mr. Prince's personal and business reputation and relationships.

6.     The Defendants acted with actual malice in publishing the defamatory statements because, prior to publication, they knew that the allegations claiming that Mr. Prince met with the Wagner Group and solicited the Wagner Group for business were false. At a minimum, the Defendants entertained serious doubts about the truth of the defamatory statements. Mr. Prince's counsel specifically told the Defendants that the statements were false before they published the Story, "that there was never a meeting with Wagner or even one considered," and that if Defendants provided "additional details" – such as where and when the alleged meetings took

place – counsel could "dig deeper" to demonstrate that the contemplated reporting was false. Defendants knowingly blindfolded themselves to the truth by rendering it impossible for The Intercept to verify its allegations about Mr. Prince's whereabouts with Mr. Prince.

7.     Defendants further blindfolded themselves to the truth by not having any source for the allegations on record.  As The Intercept knew, relying entirely on anonymous sources made it impossible for Defendants to have learned from the subject of their story, Mr. Prince, whether the sources were biased and whether the sources were in a position to know the information they told The Intercept (which they could not have been, because the underlying premise of the reporting was false).

8.     Defendants chose to publish the false and unsubstantiated statements despite their willful blindness in order to promote The Intercept's political agenda and in order to please The Intercept's left-wing funder, Pierre Omidyar, and its only remaining co-founder, Jeremy Scahill, who has dedicated decades of his career to smearing Mr. Prince. When asked by Mr. Prince after publication to retract the Story and correct the narrative, the Defendants declined to do so.

9.     The Defendants' Story barely attempts to conceal their bias against Mr. Prince. The Story essentially accuses Mr. Prince of being a traitor to his country, offering to operate in the "shadows" as an agent of the Russian military, in circumstances where the Russian government itself "seeks plausible deniability."   This skewed reporting compounds The Intercept's extensive negative coverage of Mr. Prince spanning several years. With headlines like: *"Notorious Mercenary Erik Prince is Advising Trump From The Shadows," "Inside Erik Princes Treacherous Drive to Build a Private Air Force," "Erik Prince, Perjury, and the Secret Trump Tower Meeting," "Did Blackwater's Erik Prince Lie to Congress About a Trump Tower*

*Meeting? I Asked Him," "Before He Was FBI Director, Chris Wray Supervised An Investigation That Found Erik Prince Likely Broke U.S. Law," "The Persistent Influence of Trumps Shadow Advisor Erik Prince," "The Complete Mercenary: How Erik Prince Used The Rise of Trump to Make an Improbable Comeback," "The FBI Is Investigating Erik Prince For Trying To Weaponize Crop Dusters," "Project Opus: Erik Prince and the Failed Plot to Arm a CIA Asset-Turned-Warlord in Libya,"* and "*FBI Investigation of Failed Mercenary Plot Delves Into Role of Erik Prince*," the Intercept has made its bias against Mr. Prince clear.[2]

10.    Moreover, the Defendants' newsgathering methods were designed to confirm a false narrative, not gather accurate facts. Instead of conducting a basic factual inquiry common among all responsible news organizations, the Defendants sourced their reporting from unsubstantiated claims by anonymous sources—if those anonymous sources even exist. This process was deeply flawed and represents an obvious and intentional disregard for the truth.

11.    As the Defendants intended, their Story containing several false or misleading statements about Mr. Prince garnered significant attention and has been republished and cited by other news outlets worldwide. By design, the Defendants also generated significant traffic for the Story. The Story was shared and discussed widely on Twitter, Facebook, and Reddit,

---

[2]    https://theintercept.com/2017/01/17/notorious-mercenary-erik-prince-is-advising-trump-from-the-shadows/; https://theintercept.com/2016/04/11/blackwater-founder-erik-prince-drive-to-build-private-air-force/; https://theintercept.com/2019/03/14/erik-prince-perjury-and-the-secret-trump-tower-meeting/; https://theintercept.com/2019/03/08/erik-prince-trump-mehdi-hasan/; https://theintercept.com/2018/03/19/erik-prince-frontier-services-group-chris-wray-fbi; https://theintercept.com/2019/11/05/erik-prince-trump-ukraine-china/; https://theintercept.com/2019/05/03/erik-prince-trump-uae-project-veritas/; https://theintercept.com/2020/02/20/erik-prince-fbi-investigation-trump-barr; https://theintercept.com/2021/02/26/erik-prince-jordan-libya-weapons-opus/; and https://theintercept.com/2021/10/30/fbi-libya-erik-prince-weapons-trafficking/.

among other places.

12.     Largely due to the defamatory and false statements in the Story, The Intercept's notoriety has increased at the expense of the truth and Mr. Prince's personal and professional reputation. Not surprising, therefore, The Intercept told Mr. Prince's counsel that it intended to publish additional stories about Mr. Prince's alleged business activities, and it has in fact continued to publish additional, biased stories about Mr. Prince since publication of the Story.

## PARTIES

13.     Plaintiff Erik Prince is a citizen and resident of Park County, Wyoming. Mr. Prince is a decorated veteran, having served for five years as an active-duty U.S. Navy SEAL officer, and for three more years in the Navy reserves. Following his active-duty military service, Mr. Prince founded and ran Blackwater, the U.S. government contractor that worked alongside and supported the Armed Services and other U.S. government agencies. Mr. Prince is the founder and Chairman of the private equity firm Frontier Resource Group, and was until earlier this year executive Director and Vice Chairman of Frontier Services Group, a leading provider of integrated security, logistics, insurance and infrastructure services for clients operating in frontier markets.

14.     Defendant The Intercept is a New York company with its principal place of business in New York, New York. It is an online news publication owned by First Look Media Works, Inc. The Intercept is best known for publishing classified national security intelligence leaked by Edward Snowden in violation of federal law.

15.     Defendant First Look Media Works, Inc. ("First Look Media") is a media company organized and existing as a corporation under the laws of the State of Delaware, with its principal place of business in New York, New York. It is owned by the billionaire Pierre

Omidyar, who founded eBay. At all times, First Look Media has owned and operated the URL and website www.theintercept.com.

16.     Defendant Matthew Cole is a national security reporter for The Intercept who co-authored the Story that included several false or misleading statements about Mr. Prince, as well as numerous of The Intercept's prior and subsequent stories about Mr. Prince cited in Paragraph 9, above.[3] Cole is a resident of the State of New York.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional sum of $75,000.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Plaintiff's claims occurred within this judicial district.

19.     This Court has personal jurisdiction over each of the Defendants because there are jurisdictionally sufficient minimum contacts between the Defendants and New York, and the exercise of personal jurisdiction over the Defendants in New York will not offend traditional notions of fair play and substantial justice. The Intercept and First Look Media's principal place of business is New York, and Defendant Cole was at all relevant times employed by The

---

[3]     https://theintercept.com/2016/04/11/blackwater-founder-erik-prince-drive-to-build-private-air-force/; https://theintercept.com/2018/03/19/erik-prince-frontier-services-group-chris-wray-fbi; https://theintercept.com/2019/11/05/erik-prince-trump-ukraine-china/; https://theintercept.com/2019/05/03/erik-prince-trump-uae-project-veritas/; https://theintercept.com/2020/02/20/erik-prince-fbi-investigation-trump-barr/; https://theintercept.com/2021/02/26/erik-prince-jordan-libya-weapons-opus/ and https://theintercept.com/2021/10/30/fbi-libya-erik-prince-weapons-trafficking/.

Intercept and/or First Look Media in New York. Cole worked to author the Story that forms the basis of this Amended Complaint pursuant to his employment with The Intercept and/or First Look Media, and worked with editors and other Intercept staff located in New York in the process of authoring the Story. The Defendants could thus reasonably anticipate that a suit based upon their acts and omissions with respect to the Story could result in them being subject to suit in this State, and this suit arose directly out of the Defendants' acts or omissions in relation thereto. Further, Cole is a citizen and resident of New York. All factual allegations of this Complaint with respect to the Defendants are incorporated into this paragraph by reference.

## **FACTUAL ALLEGATIONS**

### **I.    MR. PRINCE'S BUSINESS**

20.    Mr. Prince is an American businessman.

21.    After graduating college, Mr. Prince attended the U.S. Officer Candidate School and was commissioned as an officer in the U.S. Navy. He went on to become a Navy SEAL officer and a member of SEAL Team 8, one of the most elite groups within the U.S. military. After Mr. Prince's term of service in the Navy concluded following five years of active duty, Mr. Prince remained on reserve duty for an additional three years.

22.    After his term of active-duty service in the Navy concluded, in or about 1997, Mr. Prince founded Blackwater. Under Mr. Prince's leadership, Blackwater won numerous U.S. government contracts, such as providing support for government agencies in the aftermath of the bombing of the U.S.S. Cole in Yemen, assisting in the hunt for Osama Bin Laden following the September 11, 2001 attacks, providing support and training in Iraq and Afghanistan, and protecting domestic government facilities following Hurricane Katrina. Mr. Prince sold his interest in Blackwater to outside investors in 2010. Since then, Mr. Prince has founded and

served as the chairman of private equity firm Frontier Resources Group, which invests in various companies in the natural resources, logistics, and transport spaces. Mr. Prince was also appointed an executive Director and Vice Chairman of Frontier Services Group, a leading provider of integrated security, logistics, insurance, and infrastructure services for clients operating in frontier markets, a position that he held until in or about April 2021.

23.     Mr. Prince's sister is Betsy DeVos, Secretary of Education under the Trump administration.

## II.    THE INTERCEPT'S BUSINESS, POLITICAL BIAS, AND FLAWED NEWSGATHERING PROCESS

### A.  The Intercept's Founding

24.     The Intercept is an online news publication founded in February 2014 by Glenn Greenwald, Jeremy Scahill, and Laura Poitras. The Intercept is owned by Defendant First Look Media.

25.     It has been reported that The Intercept built its reputation by hiring journalists who had obtained classified National Security Agency ("NSA") documents leaked by Edward Snowden in violation of federal law, and then publishing stories based on those classified documents.

26.     The billionaire and eBay founder Pierre Omidyar provided the funding to launch The Intercept and continues to support it through his company First Look Media. According to public reports, between 2013 and 2017, Omidyar gifted $87 million worth of eBay and PayPal stock to First Look Media. He has pledged a total of $250 million to fund First Look Media's journalistic efforts.

27.     In addition to funding The Intercept, Omidyar made a $100,000 donation to the

Super PAC "NeverTrump PAC" during the 2016 presidential election. Confirming his donation, Omidyar tweeted that he thought "Trumpism is dangerous." In other tweets, Omidyar stated that "Trump is a dangerous authoritarian demagogue," a "bigot," a "thin-skinned" "scaredy-cat" with "no spine," and has publicly compared President Trump to Adolf Hitler on Twitter.

28.    As reported by other news outlets, Omidyar has touted his "soft power influence" by giving hundreds of thousands of dollars to Democratic Party candidates since 1999, donating millions to the Clinton Global Initiative, and using his "philanthropic network" to promote various regime changes around the world.

29.    Despite Omidyar's sizable donation to fund First Look Media and The Intercept, it has been publicly reported by various sources, including the Columbia Journalism Review, that The Intercept has been forced to make significant budget cuts in the past few years.  Instead of cutting the salaries of those at the top, such as the former editor-in-chief's nearly $400,000 salary, The Intercept decided to lay off its entire research team to cut costs.[4]

30.    On the heels of these budget cuts, The Intercept made repeated appeals to readers for donations. In fact, after Mr. Prince filed this lawsuit, The Intercept sent an email to its mailing list soliciting donations because "this lawsuit has cost us more than $200,000 and counting – at a time when the number of sustaining monthly donors to The Intercept has declined by nearly 20 percent."

31.    The Columbia Journalism Review inferred, in an article by Charles R. Davis on March 15, 2019, that The Intercept "has been soliciting donations from readers" because it "is classified as a 'public charity'" and must receive a substantial portion of its support from the

---

[4]    https://www.cjr.org/business_of_news/layoffs-the-intercept.php.

public to maintain that status.  It observed that "both The Intercept and its parent company are still almost entirely dependent on one billionaire, Pierre Omidyar," and "[w]hile it's unclear how much of Omidyar's funding is benchmarked for The Intercept, its largesse may force the non-profit side of the company to abandon its IRS charitable status and reclassify itself as a private foundation.  This, in turn, would mean stricter oversight, more charitable donations from the company, and more taxes on Omidyar's remaining pledge to First Look of some $160 million."[5] And because "Omidyar primarily supports First Look Media Works's operations with transfers of stock, a common method of supporting non-profit organizations that allows the donor to avoid capital gains taxes while deducting the transfer as a charitable donation," loss of "public charity" status would have serious consequences.

B.  The Intercept's History of Reckless and Biased Journalism

32.    The Intercept has a history of reckless and biased journalism of which its leadership was aware when the Story was published.  In 2016, for example, The Intercept corrected five stories and retracted one story after discovering what it conceded was "a pattern of deception" in one of its journalist's reporting.[6]    The stories that were retracted and/or corrected included quotes "attributed to people who said they had not been interviewed.  In other instances, quotes were attributed to individuals we could not reach, who could not remember speaking with him, or whose identities could not be confirmed."

33.    In 2017, The Intercept and Defendant Matthew Cole infamously rushed to publish a story about Russian interference in the 2016 election without first taking basic

---

[5]    https://www.cjr.org/business_of_news/layoffs-the-intercept.php

[6]    https://theintercept.com/2016/02/02/a-note-to-readers/.

journalistic measures, resulting in the arrest and incarceration of its source, Reality Winner.[7] Winner, a former NSA employee, printed out a report on Russian cyberattacks on American voting software and mailed it to The Intercept. The lead reporter, Cole, sent a copy of the document, which contained identifying markings, to the NSA, identifying Winner as the source, and also revealed the document's postmark to the NSA over the phone. Winner was then arrested and sentenced to more than five years in prison.

34. According to The New York Times, The Intercept's handling of Winner's tip was "one of the highest-profile journalistic disasters in recent memory and provides broader insights into the limits of a news organization dependent on an inattentive billionaire's noblesse oblige." And according to Glenn Greenwald, Pulitzer Prize winner and one of The Intercept's co-founders, "It was Intercept editors who pressured the story's reporters to quickly send those documents for authentication to the government — because they were eager to prove to mainstream media outlets and prominent liberals that The Intercept was willing to get on board the Russia gate train."

35. The Intercept's management has knowingly and recklessly cultivated a culture that rejects accountability for bad journalism. When one of The Intercept's co-founders, Laura Poitras, publicly criticized The Intercept's failure to protect Winner and its subsequent cover up of that failure, First Look Media fired her two weeks later, purportedly "without cause."[1] Poitras highlighted that The Intercept's former editor-in-chief, Betsy Reed, both "oversaw the reporting on Winner's NSA leak," and then "took an active behind-the-scenes role in the investigation,

---

[7]   https://www.nytimes.com/2020/09/13/business/media/the-intercept-source-reality-winner.html;     https://www.nytimes.com/2017/06/06/business/media/intercept-reality-winner-russia-trump-leak.html?searchResultPosition=3

assigned staff who reported directly to her to gather facts, and, when the facts pointed to editorial failures, Reed removed the staff person from the investigation."

36.    In October 2020, shortly before Poitras was fired, Greenwald resigned after The Intercept's editors censored an article he wrote that was critical of President Biden, displaying both its lack of editorial standards and its political bias.[8]  The Intercept refused to publish Greenwald's article unless he removed "all sections critical of Democratic presidential candidate Joe Biden, the candidate vehemently supported by all New-York-based Intercept editors involved in this effort at suppression."   The Intercept also attempted to prevent Greenwald from publishing the article with any other publication.  After Greenwald indicated that he did not intend to remove the sections critical of President Biden, Reed told him: "it's clear from your response this morning that you are unwilling to engage in a productive editorial process on this article, as we had hoped.  It would be unfortunate and detrimental to The Intercept for this story to be published elsewhere."[9]

37.    Greenwald has criticized The Intercept for "stand[ing] left" no matter the truth. According to Greenwald:

> Rather than offering a venue for airing dissent, marginalized voices and unheard perspectives, it is rapidly becoming just another media outlet with mandated ideological and partisan loyalties, a rigid and narrow range of permitted viewpoints (ranging from establishment liberalism to soft leftism, but always anchored in ultimate support for the Democratic Party), a deep fear of offending hegemonic cultural liberalism and center-left Twitter luminaries, and an overarching need to secure the approval and admiration of the very mainstream media outlets we created The Intercept to oppose, critique and subvert. . . .

---

[8]     https://greenwald.substack.com/p/my-resignation-from-the-intercept.

[9]     https://greenwald.substack.com/p/emails-with-intercept-editors-showing.

> In the days heading into a presidential election, I am somehow silenced from expressing any views that random editors in New York find disagreeable, and now somehow have to conform my writing and reporting to cater to their partisan desires and eagerness to elect specific candidates.

38. Earlier this year, The Intercept came under new criticism from its co-founder for putting private citizens at risk of online harassment through at least two separate articles.[10]

C. The Intercept's Sourcing and Attribution Policies and Procedures

39. The Intercept frequently relies on anonymous sources for its reporting who not only decline to go on record, but who also do not disclose their identities to The Intercept. The Intercept provides tipsters with numerous methods to provide information to its journalists anonymously.[11] The Intercept provides a SecureDrop server by which tipsters can send messages and documents to its reporters without disclosing their identity. Using the SecureDrop server requires tipster to download the Tor Browser, which allows users to conceal their IP address. The Intercept also suggests that tipsters use Signal, a secure messaging application, to send it encrypted messages.

40. Although The Intercept's own reporters and editors may have no idea about the identity of its anonymous sources, The Intercept's stated policy is to "supply readers with as many details as possible to contextualize and establish the credibility of anonymously sourced information without compromising the source."[12]

---

[10] https://www.washingtonpost.com/lifestyle/media/greenwald-intercept-feud/2021/05/20/34732c92-b727-11eb-a5fe-bb49dc89a248_story.html; https://twitter.com/ggreenwald/status/1389722584804102148.

[11] https://theintercept.com/source/

[12] https://theintercept.com/procedures/#sourcing.

41.     The Intercept did not follow this policy in the Story, which not only exclusively relied on anonymous sources, but failed to provide readers (or Mr. Prince) with any information about that sourcing—leading to the inference that The Intercept itself did not know who its sources were.

## III.   THE INTERCEPT'S PRIOR REPORTING ABOUT MR. PRINCE

A.   The Intercept's History of False and Inflammatory Reporting About Mr. Prince

42.     Since its inception, The Intercept has had a history of false reporting against Mr. Prince and a consistent disregard of the truth due to Mr. Prince's political views and public support of former President Trump.  In addition to including falsities about Mr. Prince and his business activities, these stories include inflammatory language to paint Mr. Prince out to be a right-wing extremist rather than a former Navy SEAL and businessman who has different political views than The Intercept's reporters, remaining co-founder, and benefactor.

43.     Between 2014 and the present, The Intercept published over a dozen inaccurate stories about Mr. Prince attacking his character, political views, and business record. Tellingly, almost all of the articles are written by the same reporters—Cole and The Intercept's co-founder Jeremy Scahill.  These stories are often anonymously sourced.  The Intercept's consistent disregard for the truth and bias against Mr. Prince is revealed by these articles.

44.     In one of its earliest inaccurate pieces on Mr. Prince, an October 22, 2014 story by The Intercept's co-founder Jeremy Scahill titled *"Blackwater Founder Remains Free and Rich While His Former Employees Go Down on Murder Charges,"* the Intercept—a purported news organization—described Mr. Prince as a "secretive right-wing Christian supremacist" who has "deep ties to the Bush Administration and served as a sort of neoconservative Praetorian

Guard for a borderless war launched in the immediate aftermath of 9/11."[13]  This statement about Mr. Prince is not accurate.

45.    In March 2016, The Intercept published a story by Cole and Scahill titled "*Erik Prince in the Hot Seat*," in which it alleged that Mr. Prince was under investigation for attempting to broker military services to foreign governments and "received assistance from Chinese intelligence to set up an account for his Libya operations through the Bank of China."[14] As Mr. Prince's counsel told the Intercept, the allegations in the story – which were based on anonymous sources – that he had offered defense services in Libya are false.

46.    In November 2016, after President Trump won the 2016 election, The Intercept published a story by Scahill titled "*Mike Pence Will Be the Most Powerful Christian Supremacist in U.S. History,*" in which it stated that Mr. Prince "portrays himself as a mix between Indiana Jones, Rambo, Captain America, and Pope Benedict."[15]  This statement about Mr. Prince is not accurate.

47.    In January 2017, The Intercept published a story by Scahill titled  "*Notorious Mercenary Erik Prince Is Advising Trump From the Shadows*," in which it stated that "Prince clearly views Trump's vow to bring back torture, CIA-sponsored kidnapping, and enhanced interrogations, as well as his commitment to fill Guantánamo with prisoners, as a golden opportunity to ascend to his rightful place as a covert private warrior for the U.S. national

---

[13]    https://theintercept.com/2014/10/22/blackwater-guilty-verdicts/

[14]    https://theintercept.com/2016/03/24/blackwater-founder-erik-prince-under-federal-investigation/.

[15]    https://theintercept.com/2016/11/15/mike-pence-will-be-the-most-powerful-christian-supremacist-in-us-history/

security state."[16]   This statement about Mr. Prince is not accurate.   Moreover, the story's

discussion about Prince was again based on anonymous sources.

48.     In December 2017, Cole and Scahill published a story titled "*Trump White House*

*Weighing Plans for Private Spies to Counter 'Deep State' Enemies*," which accused Mr. Prince

of making a proposal to provide a "private spy network" to the Trump administration.[17]   Both

the White House and Mr. Prince denied that Mr. Prince ever made such a proposal, and the

allegations about Mr. Prince in the story are false.   That story was once again based on

anonymous sources.

49.     In March 2018, The Intercept published a story by Cole and Scahill titled *"Before*

*He Was FBI Director, Chris Wray Supervised an Investigation That Found Erik Prince Likely*

*Broke U.S. Law,"* in which The Intercept accused Mr. Prince of violating "U.S. law while trying

to sell secretly modified paramilitary attack aircraft to Azerbaijan's military."[18]   As Mr. Prince's

representatives told The Intercept, the allegations in the story were "categorically false."   That

story was also based on anonymous sources.

50.     In May 2019, Defendant Cole authored a story for The Intercept about Mr. Prince

called "*The Complete Mercenary: How Erik Prince Used The Rise of Trump to Make an*

*Improbable Comeback*." In the story, Cole called Mr. Prince "so shady and incompetent that he

fails at almost every enterprise he attempts. And yet he endures. Prince is thus, in many ways,

---

[16]     https://theintercept.com/2017/01/17/notorious-mercenary-erik-prince-is-advising-trump-from-the-shadows/.

[17]     https://theintercept.com/2017/12/04/trump-white-house-weighing-plans-for-private-spies-to-counter-deep-state-enemies/.

[18]     https://theintercept.com/2018/03/19/erik-prince-frontier-services-group-chris-wray-fbi

an emblematic figure for the Trump era." That story went on to accuse Mr. Prince of cashing in "a favor" allegedly owed to him by the United Arab Emirates by having its ruler "facilitate[e] an introduction" to the CEO of a Russian sovereign fund.[19] As Mr. Prince has explained in sworn testimony before Congress and in meetings with the Special Counsel's office, this is false. Once more, the story was based on anonymous sources.

51.    After the Story was published, Defendants continued to publish false stories about Mr. Prince. For example, in October 2021, Defendant Cole authored a story for The Intercept called "*Project Opus: Erik Prince and the Failed Plot to Arm a CIA Asset-Turned-Warlord in Libya*." That story begins: "In 2019, Erik Prince, the founder of the notorious mercenary firm Blackwater and a prominent Donald Trump supporter, aided a plot to move U.S.-made attack helicopters, weapons, and other military equipment from Jordan to a renegade commander fighting for control of war-torn Libya." This is inaccurate. As Mr. Prince's counsel informed Cole, "Mr. Prince had no involvement in any alleged military operation in Libya in 2019, or at any other time. . . . He did not provide weapons, personnel, or military equipment to anyone in Libya." The same story, trying to emphasize Mr. Prince's ties to the Trump administration, relied on an anonymous source to call Mr. Prince a "shadow advisor" to Jared Kushner, the former President's son-in-law. This, too, was inaccurate. Kushner's own spokesman told The Intercept: "This is completely false. . . . Mr. Prince in no way served as an advisor to Mr. Kushner in any capacity."

52.    The above false and inflammatory stories are only examples of The Intercept's many stories about Mr. Prince. Other stories—also written by Cole and Scahill—included

---

[19]    https://theintercept.com/2019/05/03/erik-prince-trump-uae-project-veritas/.

inflammatory headlines like *"Inside Erik Princes Treacherous Drive to Build a Private Air Force," "The Persistent Influence of Trump's 'Shadow Advisor' Erik Prince,"* and *"The FBI Is Investigating Erik Prince For Trying To Weaponize Crop Dusters."* The Intercept also published the transcript of an interview of Scahill discussing Prince under the title *"Erik Prince, Perjury, and the Secret Trump Tower Meeting."*

B. The Intercept's Co-Founder's Obsession with Mr. Prince

53.    The Intercept's only cofounder to remain involved in the publication, Jeremy Scahill, has made his contempt for Mr. Prince a pillar of his career. Scahill constantly discusses Mr. Prince in a biased, derogatory, and false light on The Intercept's podcast, "Intercepted," among other podcasts owned by First Look Media. Scahill has sarcastically called Mr. Prince his "favorite person,"[20] and Scahill wrote an entire book about Blackwater in 2007 titled: "*Blackwater: The Rise of the World's Most Powerful Mercenary Army*." "That Blackwater founder Erik Prince is a deeply and evidently religious conservative is prima facie evidence, according to Scahill, that he and his business should be discredited. Any connection with the Religious Right or a traditional Christian heritage is somehow substantiation of political corruption and an absence of trustworthiness." "By the final pages, Scahill's vitriol discredits him and any reasonable argument he otherwise presents regarding the dangers posed by Blackwater and its sister companies. An otherwise rational contention ends up failing because of the obvious distraction of Scahill's clear political agenda."[21]

---

[20]    https://theintercept.com/2019/01/23/donald-trump-and-the-media-temple-of-boom/

[21]    https://www.airuniversity.af.edu/AUPress/Book-Reviews/Display/Article/1293179/blackwater-the-rise-of-the-worlds-most-powerful-mercenary-army/

54.    Scahill repeatedly calls Mr. Prince a Christian supremacist and an Islamophobe intent on killing Muslims for the fun of it.    As just a few examples, Scahill has made the following inaccurate and inflammatory comments about Mr. Prince on the Intercepted podcast:

a.    Mr. Prince donated to President Trump's campaign "to stop gay marriage and abortion. That's his social agenda."[22]

b.    "This is an incredibly slippery character who has repeatedly attempted to graymail the U.S. government by basically saying if you come after me, I'm going to tell the public or prosecutors where the bodies are buried in these various wars where you've contracted me to work for the CIA or the State Department or the Pentagon."[23]

c.    "He truly views himself as this misunderstood hybrid of Captain America, Indiana Jones, tied in with a little spice of Oliver North. He really views himself in that way."[24]

d.    Mr. Prince is filled with "clear Islamophobic hatred, violent hatred.[25]

e.    "I would imagine that Erik Prince fully has bought into Bannon's kind of world view, you know, particularly when it comes to kind of right-wing,

---

[22]    https://theintercept.com/2016/11/12/dissecting-a-trump-presidency/

[23]    https://theintercept.com/2019/03/14/erik-prince-perjury-and-the-secret-trump-tower-meeting/.

[24]    https://theintercept.com/2019/03/14/erik-prince-perjury-and-the-secret-trump-tower-meeting/.

[25]    https://theintercept.com/2019/03/14/erik-prince-perjury-and-the-secret-trump-tower-meeting/.

libertarian, populist nationalist tendencies."[26]

f.    "And whistleblowers in [Blackwater] said that Erik Prince set an overt agenda of Christian supremacy, that this was a war of civilization, and that essentially, all Muslims were fair game."[27]

g.    "Erik Prince is a very brilliant and evil sort of genius."[28]

55.    Far from fair and neutral reporting, Scahill has advocated in these podcasts for Mr. Prince to be questioned by the U.S. government and charged with crimes.  As just a few examples:

a.    "Erik Prince is a guy who has operated forces that have committed war crimes. And I think it would be a step forward to get him in any way you can into the crosshairs of prosecutors."[29]

b.    "These issues — and the role of Erik Prince and the Saudis, Emiratis and Israelis — should be a massive scandal . . . . [Mr. Prince] should be aggressively questioned, as part of both the criminal and Congressional investigations. Yes, Erik Prince may well have committed perjury."[30]

56.    Defendant Cole has appeared on the Intercepted podcast numerous times to

---

[26]    https://theintercept.com/2017/10/25/intercepted-podcast-mike-pence-is-the-koch-brothers-manchurian-candidate/.

[27]    https://theintercept.com/2017/04/05/intercepted-podcast-trumps-secret-little-prince/.

[28]    https://theintercept.com/2017/04/05/intercepted-podcast-trumps-secret-little-prince/.

[29]    https://theintercept.com/2019/03/14/erik-prince-perjury-and-the-secret-trump-tower-meeting/.

[30]    https://theintercept.com/2018/05/23/the-killing-machine-legalized-torture-propaganda-and-endless-war-in-the-time-of-trump/.

discuss Mr. Prince with Scahill. During those appearances, Cole has pandered to Scahill's hatred of Mr. Prince. For example, during an episode of Intercepted called "*Donald Trump and His League of Extraordinary Despots*," Cole said: "I think there isn't an opportunity for war that Erik Prince wouldn't try to sell, especially if it allows him to kill Muslims, regardless of the part of the world."[31] This exchange (in addition to the aforementioned articles by Cole and Scahill) demonstrates that: (1) Mr. Cole was aware that the co-founder of his employer strongly disliked Mr. Prince; and (2) The Intercept's leadership was aware that Mr. Cole was inclined to adopt Mr. Scahill's bias against Mr. Prince, even to the extent of baselessly accusing Mr. Prince of killing people because of their religion.

57.    On another episode, Cole said:

> I was just stunned at how much Prince was sort of parroting this, you know, the "Evil Empire's" playbook as someone who is a professed cold warrior who sort of longs for the era in which we were in a Cold War against the Evil Empire and could do all of these covert actions and paramilitary strikes to defeat the big bad Russian bear.[32]

This exaggerated, inflammatory statement about Mr. Prince is not accurate.

58.    Betsy Reed, the Intercept's editor-in-chief from 2014 through mid-2022, including when the Story was published, has worked with Scahill on reporting about Prince since 2005. She also edited Scahill's book about Blackwater published in 2007. Like Cole, Reed has appeared on the Intercepted podcast to discuss Mr. Prince with Scahill on numerous occasions. In one episode about Mr. Prince called "*Trump's Secret Little Prince*," Reed echoed

---

[31]    https://theintercept.com/2017/05/24/intercepted-podcast-donald-trump-and-his-league-of-extraordinary-despots/.

[32]    https://theintercept.com/2019/11/05/erik-prince-trump-ukraine-china/.

Scahill's many statements that Mr. Prince has a "Christian supremacist worldview," and even noted Scahill's obsession with Mr. Prince by calling him Scahill's "white whale."[33]

59.    The Intercept has also reported extensively on Mr. Prince's sister, Betsy DeVos, who it has described as "a religious Christian zealot who does not believe in the actual separation of church and state, wants public monies funneled into religious schools, and has contributed through family foundations to bigoted groups with a militant anti-gay agenda."[34]

## IV. APRIL 13, 2020: THE INTERCEPT PUBLISHES ITS FALSE AND DEFAMATORY STORY

60.    On April 13, 2020, the Defendants published the Story, titled "*Erik Prince Offered Lethal Services To Sanctioned Russian Mercenary Firm Wagner.*" The headline was accompanied by an image of Mr. Prince's head in profile mug-shot style superimposed over the Russian flag.



61.    The Story was listed prominently on The Intercept's homepage under the heading "Top Stories" and was in fact for a period of time the only story amongst The Intercept's "Top

---

[33]    https://theintercept.com/2017/04/05/intercepted-podcast-trumps-secret-little-prince/.

[34]    https://theintercept.com/2017/01/18/trump-education-nominee-betsy-devos-lied-to-the-senate/.

Stories" that did not concern the COVID-19 pandemic. A full month after the story was published, as of at least May 12, 2020, the Story (and the image depicted above) remained highlighted on The Intercepts homepage under the heading "National Security."

62.     The Story included false or misleading statements of fact as a critical part of the Defendants' continued campaign to discredit Mr. Prince.

63.     The false statements consisted primarily of assertions that Mr. Prince met last year with a top official of Russia's Wagner Group, which the story described as "a semi-private military force that operates in countries or conflicts where the Russian government seeks plausible deniability for its activities," but which is "often equipped and supported directly by the Russian Ministry of Defense." The Story stated that Mr. Prince "offered his mercenary forces to support the firm's (i.e., Wagner Group's) operations in Libya and Mozambique."

64.     The false statements in the Story also included the allegation that, at some unspecified time "[a]fter Wagner lost more than a dozen fighters in Mozambique, Prince sent a proposal to the Russian firm offering to supply a ground force as well as an aviation-based surveillance."

65.     The Defendants' statements were reasonably understood by third parties to mean that Mr. Prince and his businesses engage in unlawful activities including violating sanctions imposed on Wagner Group by OFAC, sanctions imposed in Libya by both the United States and the United Nations, and U.S. arms trafficking regulations.

66.     Specifically, the Defendants' false and expressly defamatory statements of fact in the Story include statements that Mr. Prince:

> a.     "*Offered Lethal Services To Sanctioned Russian Mercenary Firm Wagner*;"

b.    "sought in recent months to provide military services to a sanctioned Russian mercenary firm in at least two African conflicts;"

c.    "met earlier this year with a top official of Russia's Wagner Group;"

d.    "met with Wagner leadership;"

e.    "offered his mercenary forces to support the [Wagner Group's] operations in Libya and Mozambique;"

f.    sought to assist the Russian military by providing "a force in Mozambique;" and

g.    "sent a proposal to the Russian firm offering to supply a ground force as well as aviation-based surveillance."

67.    The false statements in the Story were reasonably understood by third parties to mean that Mr. Prince, who has served his country faithfully as a U.S. Navy SEAL officer, engaged in traitorous and disloyal activities against the interests of the U.S.

68.    Among other things, based on the false and defamatory statements of fact included in the Story and outlined in Paragraph 66, the Story leveled the following allegations of disloyalty against Mr. Prince:

a.    The alleged proposed relationship between Mr. Prince and Wagner would "in effect, make the influential Trump administration adviser a subcontractor to the Russian military."

b.    The Story accused Mr. Prince of seeking to aid the Libyan National Army and its leader, the "strongman Khalifa Hifter," whereas the United States and United Nations "recognize the Government of National Accord in the Libyan capital Tripoli as the country's official leaders," and "Americans are prohibited from aiding either side of the conflict without U.S. government authorization."

c.    The Story alleged that Mr. Prince has "ties to" China and the United Arab Emirates, continuing that "[t]he conflicts between Prince's commercial interests and the goals of the many governments that retain his services have piled up."

69.    In addition, the Story quoted an array of purported subject matter experts in order to bolster the Story's false claim that Mr. Prince is somehow acting adversely to U.S. interests,

behaving "egregious[ly]," and engaging in conduct that "is a dangerous thing for any democracy." Those quotations, which are based on and repeat the false and defamatory statements of fact in the Story outlined in Paragraph 66, include the following:

    a.    "Wagner Group is an instrument of Russian policy. It works under the GRU, which is the Russian military intelligence."

    b.    "In my experience, the act of soliciting from a sanctioned party would indeed be an apparent violation" of U.S. law according to one supposed expert, "adding that pitching business to Wagner 'would seem to be a fairly egregious thing to do.'"

    c.    "The reason why groups like Wagner exist, and the reason why people like Erik Prince [are] succeeding, is that modern war is getting sneakier and mercenaries and groups like Wagner are a great way to get things done in the shadows."

    d.    "The conflicts of interest are deep and threaten democracy when you have a free agent going between the U.S. and its main power rivals . . . . It would never clear an intelligence community background check. This is a dangerous thing for any democracy."

70.    Mr. Prince did not meet with any representative of Wagner Group, never offered his services to support Wagner Group's operations in Libya and Mozambique, and never sent Wagner Group a proposal to offer his services in those countries. In fact, Mr. Prince has never met with a representative of Wagner Group.  Nor has Mr. Prince caused any third party to meet with or submit a proposal to Wagner Group on his behalf.

71.    The Defendants knew this because the allegation that Mr. Prince met with the Wagner Group to attempt to support Russia's operations in Libya is inherently improbable.  Mr. Prince has been a critic of Russia's involvement in the conflict in Libya, and his criticism has been well publicized.  The 2019 Mueller Report made allegations about meetings between Mr. Prince and Kirill Dmitriev, the CEO of a Russian sovereign wealth fund, in which Mr. Prince told Dmitriev that Russia's involvement in Libya would make the situation "much worse:"

Afterwards, Prince returned to his room, where he learned that a Russian aircraft carrier had sailed to Libya, which led him to call Nader and ask him to set up another meeting with Dmitriev. According to Nader, Prince called and said he had checked with his associates back home and needed to convey to Dmitriev that Libya was "off the table." Nader wrote to Dmitriev that Prince had "received an urgent message that he needs to convey to you immediately," and arranged for himself, Dmitriev, and Prince to meet at a restaurant on the Four Seasons property.

At the second meeting, Prince told Dmitriev that the United States could not accept any Russian involvement in Libya because it would make the situation there much worse.[35]

72.    Prior to publishing the Story at issue, the Defendants reported on Mr. Prince's opinion on Russia's involvement in Libya, as described in the Mueller Report.  For example, Defendant Cole authored an article about Mr. Prince in May of 2019 that stated as follows:

After the first meeting, Prince learned that an Russian aircraft carrier was moving off the coast of Libya, according to the Mueller report. Prince, who has spent years offering his paramilitary services in Libya, was incensed at the news, calling Nader to demand a second meeting with Dmitriev. Prince told Nader that he'd just checked with his "associates" and needed to convey an important message to Putin's emissary. Prince told Mueller that he was speaking only for himself, based on his three years as a Navy SEAL. In the second meeting, Prince went off-script and warned Dmitriev that the U.S. could not accept Russian involvement in Libya.[36]

---

[35]    Report On The Investigation Into Russian Interference In The 2016 Presidential Election at 154, https://www.justice.gov/archives/sco/file/1373816/download.  In quoting from the Mueller Report, Mr. Prince does not intend to credit in its entirety George Nader's statements that he was conveying "a message" from "his associates back home."  As set forth in the next paragraph, Mr. Prince told the Special Counsel's Office that he was speaking only for himself, based on his personal views – including his personal view that Russia had no place in the Libyan conflict.

[36]    https://theintercept.com/2019/05/03/erik-prince-trump-uae-project-veritas/.

Cole and Scahill also discussed how Mr. Prince told Dmitriev that "the Russians have to stay out of Libya" on the Intercepted podcast.[37]

73.     The Defendants also failed to include any information whatsoever about their anonymous sources in the Story, making it impossible for readers to assess the credibility of the sources.  Therefore, The Intercept failed to comply with its own stated "Policies and Procedures" requiring it to "supply readers with as many details as possible to contextualize and establish the credibility of anonymously sourced information without compromising the source."[38]

74.     The Story provides no details, such as when or where or with whom the alleged meeting took place or the alleged proposal was submitted, no context, and no information with which the credibility of its anonymous sources could be vetted or challenged. The Story does not even describe how its sources were in a position to know what The Intercept reported.

75.     For example, the Story does not state that its sources were present at any meeting between Mr. Prince and Wagner, worked for Wagner, or worked for Mr. Prince, and provides no information about how The Intercept determined that its sources were credible.

76.     As set out above, it is reasonable to infer based on the total absence of context in violation of The Intercept's policies, as well as The Intercept's practice of accepting entirely anonymous information, that even the Defendants did not know the identity or bona fides of its anonymous sources.

77.     Despite regularly relying on anonymous sources when writing about Mr. Prince, The Intercept knows how to attempt to comply with its stated policies when it wants to do so.

---

[37]     https://theintercept.com/2019/05/01/shadow-players-erik-prince-julian-assange-and-the-bizarre-world-of-trump/.

[38]     https://theintercept.com/procedures/#sourcing

In prior reporting about Mr. Prince, The Intercept has at the very least described its anonymous sources and evidence in a general manner so that readers can form a view as to whether or not to credit the allegations.  For example, in one prior story about an alleged investigation into Mr. Prince's business activities, The Intercept explained that it

> interviewed more than a half dozen of Prince's associates, including current and former business partners; four former U.S. intelligence officers; and other sources familiar with the Justice Department investigation. All of them requested anonymity to discuss these matters because there is an ongoing investigation. The Intercept also reviewed several secret proposals drafted by Prince and his closest advisers and partners offering paramilitary services to foreign entities.[39]

This former story, as did other prior reporting by The Intercept, also attributed specific quotes to sources which it described in a way that would allow readers to understand why the source had relevant information.

78.    As another example, a different prior story also explained what kind of evidence The Intercept reviewed and why its sources should be viewed as credible:

> The story of how Prince secretly plotted to transform the two aircraft for his arsenal of mercenary services is based on interviews with nearly a dozen people who have worked with Prince over the years, including current and former business partners, as well as internal documents, memos, and emails. . . .

> "It's very difficult to manufacture [such aircraft] in Austria and keep everything quiet," said a former Airborne employee who worked on the plane.

> The Intercept has reviewed dozens of documents relating to the modifications of the Thrush aircraft in Austria. The former Airborne employee, who played a central role in the modifications performed on the Thrush, agreed to speak with The Intercept on the condition

---

[39]    https://theintercept.com/2016/03/24/blackwater-founder-erik-prince-under-federal-investigation/.

of anonymity because of the sensitivity of the program and fears of retaliation by Prince and Airborne. [40]

79.     In yet another prior story, Defendant Cole described the evidence he relied upon in making allegations about Mr. Prince, stating that: "This account is based on interviews with more than a dozen of Prince's former colleagues and peers, as well as court records, emails, and internal documents provided to The Intercept."[41] He also explained that his sources were "former employees," "former colleagues," "former associates," "former Reflex employees and consultants," "a former Trump White House official," and others.

80.     In the Story at issue, The Intercept did not explain in the slightest what evidence or sources supported its allegations, or why its sources required anonymity. This is because the sources for the false Story lacked credibility (or were anonymous to even the Defendants, meaning that they had no ability to vet their credibility), and the Defendants either fabricated the Story or, at a minimum, knew that there was no information that they could provide in the Story to establish the credibility of the sources to readers.

81.     At the time the Story was published, Mr. Prince had never publicly spoken about the allegations in the Story or the issues discussed in the Story. He had never written, given an interview, or otherwise spoken publicly about selling military contractor services to Russia or the United States' sanctions on Russian mercenaries including, but not limited to, the Wagner Group. Further, prior to the publication of the Story, Mr. Prince had never before been accused of offering to sell military services to Russian mercenaries, the Russian government, any other

---

[40]     https://theintercept.com/2016/04/11/blackwater-founder-erik-prince-drive-to-build-private-air-force/.

[41]     https://theintercept.com/2019/05/03/erik-prince-trump-uae-project-veritas/.

sanctioned Russian person or entity, or America's enemies.  To the contrary, Mr. Prince has

publicly referred to Russia as one of "our opponents."

## V.   MR. PRINCE DENIED ALL OF THE ALLEGATIONS WITH AS MUCH DETAIL AS THE INTERCEPT'S REPORTING ALLOWED AND REQUESTED MORE INFORMATION

82.    The Defendants' first and only attempt to contact Mr. Prince prior to publication

of the Story came in a comment call e-mail on the afternoon of Friday, April 10, 2020. The

e-mail, from Defendant Matthew Cole to Mr. Prince's counsel, indicated that The Intercept

intended to publish a story "early next week" including the allegation that Mr. Prince met with

a Wagner Group senior official earlier in 2020, and that he had caused a third party to submit a

proposal to Wagner on his behalf.

83.    Counsel promptly responded to Cole by email that same day, within less than 90

minutes, stating that his allegations were false, and specifically that Mr. Prince had never met,

or even considered meeting, representatives of Wagner.

84.    In that email, counsel also requested information about the supposed meeting—

such as when or where it supposedly took place—so that he could demonstrate to Cole that no

such meeting ever happened or so that Mr. Prince could more specifically respond.  For example,

if Mr. Prince knew when and where the meeting with Wagner supposedly took place, he could

have demonstrated with travel or other records that he was elsewhere at the time.  If Mr. Prince

knew who he purportedly met with, he could have countered with a specific denial that he had

never spoken with or met that individual.  If Mr. Prince knew who purportedly submitted a

proposal to Wagner on his behalf, he could have verified whether that person had the means or

authority to do so, among other things.  But Cole did not provide any information despite

counsel's request, leaving Mr. Prince unable to do any more than tell Cole that no meeting with

Wagner ever occurred or was considered.

85.    In fact, Cole did not respond to counsel's email at all.  Instead, on the morning of Monday, April 13, 2020, The Intercept posted the Story, including the false and misleading allegations that Mr. Prince had met with and solicited business from a senior Wagner Group representative, and that he had caused a written proposal to be delivered to Wagner Group.  Mr. Prince was the only source identified in the story and he denied it was true.

86.    The Defendants published the Story knowing that it contained false allegations, and without any follow-up with Mr. Prince or his counsel, in order to advance their own false narratives about Mr. Prince and to please Scahill and Omidyar.  Defendants knew, from their prior published reporting on Mr. Prince, that he was highly critical of Russia's intervention in Libya, making it inherently improbable that he would have offered to provide Russia with mercenary forces in Libya.

87.    The Intercept's complete stonewalling of Mr. Prince (and its readers) by refusing to provide any information that would permit him to refute the Story reflected a deviation from its prior practice in reporting on Mr. Prince.  For some of its prior stories, The Intercept made serious attempts to engage with Mr. Prince in a manner that conveyed information with which he could specifically refute the allegations.  For example, for multiple of its prior stories, The Intercept's reporters had telephone conversations with Mr. Prince's counsel aimed at understanding Mr. Prince's perspective on allegations against him and to exchange relevant information about the allegations.  In many of those stories, The Intercept allowed Mr. Prince's

counsel to discuss specific allegations and included certain of those responses in its reporting.[42] Defendants' refusal to provide Mr. Prince with any information with which he could verify or refute the Story reflects Defendants' knowledge of the probable falsity of their Story.

88.    Prior to publishing other prior stories, The Intercept has also spoken to Mr. Prince directly, on the record.[43]  Here, the Defendants did not even respond to Mr. Prince's counsel's email requesting more information prior to publishing the Story at issue.

## VI.    AS INTENDED, THE APRIL 13 STORY WAS REPUBLISHED, CITED, AND SHARED THROUGHOUT THE WORLD

89.    As the Defendants intended, news outlets throughout the world republished or cited The Intercept's April 13 Story.

90.    On April 13, 2020, the *Daily Beast* published an article titled *"Erik Prince Offered Military Services to Sanctioned Russian Mercenary Firm: Report."*[44] The article cited The Intercept's Story published earlier that day, reporting that: "Erik Prince, founder of the private security company Blackwater and a Trump administration adviser, has recently attempted to cultivate a business relationship with a sanctioned Russian paramilitary organization called the Wagner Group, The Intercept reported on Monday."

91.    The same day, *The Intellectualist* published an article titled *"Report: Erik Prince*

---

[42]    *See, e.g.*,    https://theintercept.com/2016/03/24/blackwater-founder-erik-prince-under-federal-investigation/ ("As for Prince's alleged meetings with Chinese intelligence, Toensing [Mr. Prince's counsel] confirmed that Prince had met with internal security officials in Beijing, but claimed it was in connection to medical evacuation operations.").

[43]    https://theintercept.com/2019/03/08/erik-prince-trump-mehdi-hasan/.

[44]    https://www.thedailybeast.com/erik-prince-offered-military-services-to-sanctioned-russian-mercenary-firm-wagner-report-says

*Offered His Services To Sanctioned Mercenary Backed By Putin."*[45] The article parroted The Intercept's false reporting, writing that: "The Intercept reported Monday that Prince, who is the brother of Education Secretary Betsy DeVos, met with one of Wagner's top officials to offer his mercenary forces in two current conflicts in Africa—those in Libya and Mozambique."

92.     The following day, The Moscow Times published an article titled "*Trump-Linked Contractor Offered Military Services to Russia's Wagner in Africa—Intercept*."[46] Again, the article cited The Intercept Story and claimed that Mr. Prince "offered military services to Russia's Wagner mercenary group in Libya and Mozambique earlier this year, Investigative website The Intercept reported Monday."

93.     On April 19, 2020, *SOFREP,* a leading digital media company focused on military news, published an article titled *"Wagner Group: Russian Mercenaries Still Floundering In Africa."*[47] Citing The Intercept's Story, *SOFREP* wrote that, "Prince reportedly met earlier this year with a Wagner Group official and offered to bolster Wagner's operations in Libya and Mozambique."

94.     Even the Wikipedia entry for "Wagner Group" now includes the allegation, citing the Story, that "Early in 2020, Erik Prince, founder of the Blackwater private military company, sought to provide military services to the Wagner Group in its operations in Libya and Mozambique, according to *The Intercept*."[48]

---

[45]     https://mavenroundtable.io/theintellectualist/news/report-erik-prince-offered-his-services-to-sanctioned-mercenary-backed-by-putin

[46]     https://www.themoscowtimes.com/2020/04/14/trump-linked-contractor-offered-military-services-to-russias-wagner-intercept-a69986

[47]     https://sofrep.com/news/wagner-group-russian-mercenaries-still-foundering-in-africa/

[48]     https://en.wikipedia.org/wiki/Wagner_Group

95.     Other outlets have picked up and/or republished the Story, as well.[49]

96.     In addition to the Story being picked up by other news outlets, the Story garnered significant traffic on social media.

97.     On April 13, 2020, The Intercept's Twitter account tweeted or re-tweeted a link to the Story five separate times in a single day. Defendant Matthew Cole and his co-author Alex Emmons also tweeted links to the Story. Many influential media personalities, including CNN's Jake Tapper, MSNBC's Malcolm Nance, Politico's Natasha Bertrand, the Daily Beast's Noah Shachtman, and the New York Times's Adam Goldman, shared the Story on Twitter, as well. Combined, these tweets have generated almost five thousand "re-tweets," Twitter "shares," and "likes," all of which further spread the false and defamatory narrative about Mr. Prince. For example, whereas The Intercept's Twitter account was at the time followed by approximately 800,000 users, Jake Tapper alone was at the time followed by approximately 2.4 million people—all of whom would have been notified about the Story.

98.     In addition, as of May 7, 2020, the Story had generated over nine thousand messages on Reddit discussion boards. On Facebook, the Story was the subject of more than 16,100 engagements (comments, "likes," or shares).

99.     In response to the Story, Mr. Prince's own Wikipedia page was also updated. The page now includes an entire section under the heading "*Proposed cooperation with Wagner group and activities in Libya*," which states: "In April 2020, *the Intercept* reported that Prince

---

[49]     *See, e.g.*, https://www.democraticunderground.com/113326906; https://inforussie.com/2020/04/14/trump-linked-contractor-offered-military-services-to-russias-wagner-in-africa-intercept/; https://eutoday.net/news/security-defence/2020/new-entry; https://warontherocks.com/2020/05/pulling-troops-out-of-africa-could-mean-another-endless-war/

has offered his services as a subcontractor to Russian Wagner group's activities in Mozambique and Libya, suggesting to provide aerial surveillance platforms and a ground force." The Wikipedia page also links directly to the Story.[50]

100.    On December 2, 2021, The Intercept reported on this lawsuit, again highlighting the false allegations in the Story.

101.    On October 7, 2022, Defendant Matthew Cole again tweeted a link to the Story.

102.    The broad dissemination of the Story across many media and social media platforms has further harmed Mr. Prince's personal and professional reputation.

## VII. THE INTERCEPT FAILED TO CORRECT OR RETRACT ITS DEFAMATORY STORY

103.    On April 13, 2020, counsel for Mr. Prince sent the Defendants a letter reiterating that their reporting on Mr. Prince in the Story was false and defamatory. Counsel noted that Mr. Prince never met with any representative of Wagner Group, never offered Wagner Group or any other Russian individual mercenary services, and certainly never submitted or caused to be submitted on his behalf a proposal to Wagner Group.

104.    In addition to noting that the factual underpinnings for The Intercept's Story were categorically false, counsel highlighted the deeply flawed "newsgathering" process. Specifically, counsel noted that The Intercept failed to conduct the most basic factual inquiries common among all responsible news organizations, and instead uncritically repeated the false and unsubstantiated claims of anonymous sources. For example, counsel pointed out that the Story was based entirely on anonymous sources who refused to even be quoted on the record,

---

[50]    https://en.wikipedia.org/wiki/Erik_Prince

The Intercept's clear bias towards Mr. Prince, its history of incorrect coverage of Mr. Prince, and its departure from its own sourcing policies and prior practice in reporting on Mr. Prince in the Story.

105.    In the letter, counsel for Mr. Prince asked Defendants to take down and retract the Story.

106.    The next day, in-house counsel for First Look Media responded that The Intercept stood by the Story.  First Look Media stated that the Story was based on "human sources and documents provided to the Intercept" and "was carefully and thoroughly researched" (despite The Intercept having laid off its entire research team).  Yet the Defendants again did not provide a single piece of information about the sources or documents on which it based the Story.

107.    In that letter, the Defendants declined to retract, correct, or take down the April 13 Story about Mr. Prince.  Instead, the Defendants' lawyer warned that the April 13 Story was just "one in a series of planned articles concerning Mr. Prince's activities."

108.    The Defendants also invited Mr. Prince to share information supporting his contention that the Story is false, and also suggested a meeting with Mr. Prince to discuss his "concerns" and to give him "every opportunity to provide information and documents that may be germane to the previous article and the future articles planned."  The Defendants made this empty invitation despite the Defendants' knowledge that prior to the Story's publication, counsel for Mr. Prince explicitly asked Cole for details about where and when the alleged meetings took place so that Mr. Prince could refute the allegations and Cole refused to provide any details whatsoever.

109.    On April 17, 2020, counsel for Mr. Prince once again sent the Defendants a letter

reiterating that their reporting on Mr. Prince in the April 13 Story was false and defamatory, and again asked the Defendants to take down and retract the Story. Mr. Prince's counsel noted that the Defendants' invitation for Mr. Prince to share "information" was not made in good faith because Defendants provided "no information about when or where this supposed meeting between Mr. Prince and a representative of Wagner took place, who the Wagner representative was, or other details that would enable Mr. Prince to respond." Counsel explained that proving a negative—that a meeting never happened—is impossible without such information. Counsel for Mr. Prince again asked the Defendants to provide the information so Mr. Prince could more fully respond to the allegations.

110.    In response, the Defendants again declined to provide additional information about their allegations or take down and retract the Story. As of the date of this Amended Complaint, the Story has not been corrected in any way.

111.    The Defendants' said that the April 13, 2020 Story was just one in a series of planned articles about Mr. Prince. The Intercept, however, did not publish a single additional article about Mr. Prince until February 26, 2021, when Matthew Cole published his false story about Mr. Prince's involvement in "Project Opus." That story included false allegations that Mr. Prince plotted to provide Khalifa Hifter with military equipment from Jordan for use in the civil war in Libya.[51] Mr. Prince's counsel told Cole prior to publication that Mr. Prince categorically denied having any involvement in any military operation in Libya in 2019 or at any other time. Individuals who Cole alleged Prince worked with as part of "Project Opus" also denied having any business relationship with Mr. Prince on the record. Then in October 2021,

---

[51]    https://theintercept.com/2021/02/26/erik-prince-jordan-libya-weapons-opus/.

Cole published a follow-up story claiming that the FBI was investigating "Project Opus," including Mr. Prince's alleged (but, in reality, non-existent) role in it.[52]  Mr. Prince's counsel again denied the allegations.

112.   On October 21, 2022, Mr. Prince's counsel sent the Defendants' counsel a letter. In the letter, Mr. Prince's counsel asked the Defendants' counsel to identify the sources Defendants relied on in the Story or, presuming they would decline to do so, but given that this information is uniquely in the Defendants' control, to provide non-identifying information about The Intercept's sources, information about purported evidence underlying the Story, and information about their newsgathering process so that Mr. Prince might understand why and how The Intercept determined that their information was reliable prior to publishing the Story. Specifically, Mr. Prince's counsel asked:

> For each of the Defamatory Statements (defined in the SDNY Complaint), on how many sources did The Intercept rely in publishing the statement?

> With what entity, association, or company are the "three people with knowledge of the efforts" described in the Article (*see* Article p. 1) affiliated?

> Are the "three people familiar with [Wagner's] decision" not to work with Mr. Prince (*see* Article p. 1) Wagner officials?  If not, with what entity, association, or company are they affiliated?  Are these "three people" the same "three people with knowledge of the efforts" mentioned in the first paragraph in the Article?

> With what entity, association, or company is the "person familiar with Prince's proposal" (*see* Article p. 4) affiliated?  Is this one of the "three people with knowledge of the efforts" mentioned in the first paragraph in the Article?

---

[52]    https://theintercept.com/2021/10/30/fbi-libya-erik-prince-weapons-trafficking/.

Were any of the sources for the Article former employees of Frontier Services Group?

Do any of the sources contend they were physically present at a meeting between Mr. Prince and any official of Wagner?

Do any of the sources contend they were physically present at a meeting or call between Mr. Prince and Khalifa Haftar?

Do any of the sources contend they discussed Mr. Prince's proposal to Wagner with Mr. Prince?

Did the Intercept receive and review any recordings of alleged meetings between Mr. Prince and Wagner?

Did all of the anonymous sources disclose their identities to The Intercept, or did some or all of the sources provide information to The Intercept anonymously?

What efforts did The Intercept undertake to establish the credibility of its sources?  What efforts did the Intercept take to understand the bias of any of its sources?

Did the Intercept review a copy of the proposal allegedly sent by Mr. Prince to "the Russian firm offering to supply a ground force as well as aviation-based surveillance"?  If not, please describe the "documents viewed by the Intercept" that purportedly demonstrate that "Prince sent a proposal to the Russian firm offering to supply a ground force as well as aviation-based surveillance" (*see* Article p. 4)?

Who sent the Intercept the "documents viewed by the Intercept" (*see* Article p. 4)?

In what format did The Intercept receive the "documents viewed by the Intercept" (*see* Article p. 4)?

What efforts did The Intercept undertake to establish the authenticity of the "documents viewed by the Intercept" (*see* Article p. 4)?

Why did the Intercept's reporters decline to speak with Mr. Prince prior to publication of the Article?

What efforts did the Intercept undertake to confirm Mr. Prince's whereabouts at the times of the alleged meetings with Wagner?

What information inconsistent with the Defamatory Statements in the Article did the Intercept's reporters decide not to credit in publishing the Article?

113.    In response to Mr. Prince's counsel's letter, the Defendants did not provide any requested information, stating that they "decline your request."

114.    In his October 21, 2022, letter, Mr. Prince's counsel also asked for permission to include facts learned during settlement communications in this pleading – facts that would have allowed Mr. Prince to affirmatively disprove the false allegations in the Story.    The Defendants stated that they "do not consent to you disclosing any of the substance of the settlement communications that have taken place in connection with this matter."

## VIII. MR. PRINCE HAS SUFFERED HARM AS A RESULT OF THE DEFENDANTS' ACTIONS

115.    By spreading false and misleading information about Mr. Prince, and by accusing him of being a criminal and a traitor, the Defendants have placed Mr. Prince in a false light before the world-at-large and have caused Mr. Prince serious damage to his personal and professional reputation.

116.    By falsely claiming that Mr. Prince engaged in illegal conduct and violated U.S. and U.N. sanctions and U.S. arms trafficking regulations by allegedly soliciting business from Wagner Group, the Defendants have portrayed Mr. Prince—a decorated veteran—as a criminal and disloyal to his nation.

117.    These allegations have caused Mr. Prince to suffer substantial harm and special damages under the law including, without limitation, monetary loss; harm to Mr. Prince's reputation and good will; resulting loss of profits; interference with and damage to Mr. Prince's relationships with contractual partners, bankers, lenders, and the media; loss of market share, business opportunities, and access to markets and investors worldwide; loss of recruiting

41

opportunities; loss of investment capital; loss of operating capital; impairment of his ability to raise capital through equity and debt markets; and impairment of his ability to continue to grow his clientele.

## **FIRST CAUSE OF ACTION**

### **Defamation Per Se**
### **(Against All Defendants)**

118.    The Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

119.    The Defendants made false and defamatory statements as alleged herein about Mr. Prince and published these statements in writing to unprivileged third parties including, but not limited to, persons viewing the Defendants' websites and persons viewing websites republishing the Defendants' defamatory statements.

120.    The Defendants made false and defamatory statements concerning Mr. Prince in the April 13, 2020 Story titled *"Erik Prince Offered Lethal Services To Sanctioned Russian Mercenary Firm Wagner"* which was published on www.theintercept.com and included the following false statements of fact:

      a.    The title itself is false: "*Erik Prince Offered Lethal Services To Sanctioned Russian Mercenary Firm Wagner;*"

      b.    That Mr. Prince "sought in recent months to provide military services to a sanctioned Russian mercenary firm in at least two African conflicts;"

      c.    That Mr. Prince "met earlier this year with a top official of Russia's Wagner Group;"

      d.    That Mr. Prince "met with Wagner leadership;"

      e.    That Mr. Prince "offered his mercenary forces to support the [Wagner Group's] operations in Libya and Mozambique;"

      f.    That Mr. Prince sought to assist the Russian military by providing "a force

in Mozambique;"

    g.    That "[a]fter Wagner lost more than a dozen fighters in Mozambique, Prince sent a proposal to the Russian firm offering to supply a ground force as well as aviation-based surveillance."

121.    The Defendants' statements were defamatory, tending to expose Mr. Prince to public hatred, contempt, ridicule and disgrace. The Defendants' statements also tend to discredit Mr. Prince in the conduct of his business.

122.    In truth, Mr. Prince did not meet with any representative of Wagner Group in early 2020, never offered his services to support Wagner Group's operations in Libya and Mozambique, and never sent Wagner Group a proposal to offer his services in those countries. In fact, Mr. Prince has never met with a representative of Wagner Group. Nor has Mr. Prince caused any third party to meet with or submit a proposal to Wagner Group on his behalf.

123.    The Defendants knew it was foreseeable that that the defamatory statements in Paragraph 120 would be repeated by second parties. The Defendants, as the originators, are liable for each repetition of the defamatory matter by second parties.

124.    The Defendants made the defamatory statements in Paragraph 120 with knowledge of their falsity, with reckless disregard of their truth or falsity, or with negligence. Specifically, Defendants knew or were reckless in not knowing that the Story was false because:

    a.    The Story was inherently improbable that Mr. Prince would attempt to aid Russia's involvement in the Libyan conflict;

    b.    The Story was in contradiction to Defendants' prior reporting on Mr. Prince's opposition to Russia's involvement in the Libyan conflict;

    c.    Defendants relied only on anonymous sources in publishing the Story;

    d.    Defendants failed to provide Mr. Prince with any information about its sources, even on a no-name basis, with which Mr. Prince could challenge the source's bias or ability to know the facts as to which they were the purported source;

e.   Defendants published no information about how its sources came to obtain information supporting the Story;

f.   Defendants did not publish or even describe any documents allegedly supporting their Story;

g.   Defendants failed to verify their allegations with Mr. Prince including by refusing, despite his request, to provide him with information such as when, where, and with whom he allegedly met, knowing that such information was essential for Mr. Prince to prove that the Story was false;

h.   Mr. Prince denied the story to the fullest extent possible with the information that Defendants provided him;

i.   Defendants have waged a long campaign of publishing knowingly false allegations against Mr. Prince;

j.   The Intercept's sole remaining co-founder made clear to the Intercept's employees, including Cole, that he supported publication of negative information about Mr. Prince irrespective of the truth;

k.   The Intercept has a record of reckless reporting practices;

l.   The Intercept has a record of publishing stories that attack politically conservative figures and support liberal figures irrespective of their truth, including altercations that led the Intercept's co-founder, Glen Greenwald, to leave the organization; and

m.   Even after publication of the Story, the Defendants still refused to provide Mr. Prince with information that would allow him to rebut the allegations in the Story or with information about its sources that would allow him to demonstrate their bias or lack of credibility.

125.   The Defendants made the defamatory statements in Paragraph 120 with the intent and import that the statements were assertions of facts and not merely opinion.

126.   The Defendants knew such statements disparaged Mr. Prince and his business, and intended these statements to cause Mr. Prince pecuniary loss.

127.   The Defendant's defamatory statements in Paragraph 120 were made as part of a long scheme by the Defendants to publish false, misleading, and defamatory statements about Mr. Prince in order to discredit Mr. Prince, further the Defendants' political agenda, boost The

Intercept's readership, and reap the associated financial gains, including the continued viability of the publication.

128.    The statements in Paragraph 120 had a natural and probable defamatory effect on the reader without the necessity of explanatory matter and accordingly, the Defendants' defamatory statements are defamatory per se. Among other things, the defamatory statements impugn Mr. Prince's business reputation and accuse him of illegal, traitorous, and disloyal conduct.

129.    The Defendants' defamatory statements in Paragraph 120 were a substantial factor in causing harm to Mr. Prince, including without limitation, monetary loss; harm to Mr. Prince's reputation and good will; resulting loss of profits; interference with and damage to Mr. Prince's relationships with contractual partners, bankers, lenders and the media; loss of market share and business opportunity for his services; loss of recruiting opportunities; loss of investment capital; loss of operating capital; impairment of his ability to raise capital through equity and debt markets; and impairment of his ability to continue to grow his clientele.

130.    Mr. Prince is entitled to injunctive relief restraining the Defendants from committing further defamation per se.

131.    The Defendants made the defamatory statements in Paragraph 120 with fraud, oppression, actual malice, malicious intent, and with intent to cause the foregoing and other harm to Mr. Prince and his business.  Accordingly, Mr. Prince is entitled to, and should be awarded, punitive damages against each of the Defendants.

## SECOND CAUSE OF ACTION
### Defamation Per Quod
### (Against All Defendants)

132.     The Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

133.     The Defendants made false and defamatory statements as alleged herein about Mr. Prince and published these statements in writing to unprivileged third parties including, but not limited to, persons viewing the Defendants' websites and persons viewing websites republishing the Defendants' defamatory statements.

134.     To the extent any of the defamatory statements identified in Paragraph 120 and incorporated herein by reference are not defamatory per se, they are defamatory per quod. Because of facts and circumstances known to the readers of the statements, the statements tended to injure Mr. Prince's business.

135.     The Defendants' statements were defamatory, tending to expose Mr. Prince to public hatred, contempt, ridicule, and disgrace. The Defendants' statements also tend to discredit Mr. Prince in the conduct of his business. In particular, the Defendants' statements were reasonably understood by third parties to mean that Mr. Prince and his business engage in unlawful activities including violating sanctions imposed on Wagner Group by OFAC, sanctions imposed in Libya by the U.S., U.N., and other authorities, and U.S. arms trafficking regulations. The statements also were reasonably understood by third parties to mean that Mr. Prince, who has served his country faithfully as a U.S. Navy SEAL officer, engaged in disloyal activity.

136.     The Defendants made false and defamatory statements concerning Mr. Prince in the April 13, 2020 Story titled "*Erik Prince Offered Lethal Services To Sanctioned Russian*

46

*Mercenary Firm Wagner*," which was published on www.theintercept.com. Copies of related materials were made available to unprivileged third parties including, but not limited to, persons viewing the Defendants' websites and persons viewing websites republishing the Defendants' defamatory statements.

137.    The Defendants knew it was foreseeable that the defamatory statements would be repeated by second parties. The Defendants, as the originators, are liable for each repetition of the defamatory matter by second parties.

138.    The Defendants made the defamatory statements with knowledge of their falsity, with reckless disregard of their truth or falsity, or with negligence.  Specifically, Defendants knew or were reckless in not knowing that the Story was false because:

> a.    The Story was inherently improbable that Mr. Prince would attempt to aid Russia's involvement in the Libyan conflict;
>
> b.    The Story was in contradiction to Defendants' prior reporting on Mr. Prince's opposition to Russia's involvement in the Libyan conflict;
>
> c.    Defendants relied only on anonymous sources in publishing the Story;
>
> d.    Defendants failed to provide Mr. Prince with any information about its sources, even on a non-name basis, with which Mr. Prince could challenge the source's bias or ability to know the facts as to which they were the purported source;
>
> e.    Defendants published no information about how its sources came to obtain information supporting the Story;
>
> f.    Defendants did not publish or even describe any documents allegedly supporting their Story;
>
> g.    Defendants failed to verify their allegations with Mr. Prince including by refusing, despite his request, to provide him with information about when, where, and with whom he allegedly met, knowing that such information was essential for Mr. Prince to prove that the Story was false;
>
> h.    Mr. Prince denied the story to the fullest extent possible with the information that Defendants provided him;

     i.     Defendants have waged a long campaign of publishing knowingly false allegations against Mr. Prince;

     j.     The Intercept's sole remaining co-founder made clear to the Intercept's employees, including Cole, that he supported publication of negative information about Mr. Prince irrespective of the truth and that he was out to "get him in any way you can";

     k.     The Intercept has a record of reckless reporting practices;

     l.     The Intercept has a record of publishing stories that attack politically conservative figures and support liberal figures irrespective of their truth, including altercations that led the Intercept's co-founder, Glen Greenwald, to leave the organization; and

     m.     Even after publication of the Story, the Defendants still refused to provide Mr. Prince with information that would allow him to rebut the allegations in the Story or with information about its sources that would allow him to demonstrate their bias or lack of credibility.

139.    The Defendants made the defamatory statements with the intent and import that the statements were assertions of facts and not merely opinion.

140.    The Defendants knew such statements disparaged Mr. Prince and his business, and intended these statements to cause Mr. Prince pecuniary loss.

141.    The Defendants' defamatory statements were made as part of a long scheme by the Defendants to publish false, misleading, and defamatory statements about Mr. Prince in order to discredit Mr. Prince, further the Defendants' political agenda, boost The Intercept's readership, and reap the associated financial gains, including the continued viability of the publication.

142.    The Defendants' defamatory statements were a substantial factor in causing harm to Mr. Prince, including without limitation, monetary loss; harm to Mr. Prince's reputation and good will; resulting loss of profits; interference with and damage to Mr. Prince's relationships with contractual partners, bankers, lenders and the media; loss of market share and business

opportunity for his services; loss of recruiting opportunities; loss of investment capital; loss of operating capital; impairment of his ability to raise capital through equity and debt markets; and impairment of his ability to continue to grow his clientele.

143.    Mr. Prince is entitled to injunctive relief restraining the Defendants from committing further defamation per quod.

144.    The Defendants made their defamatory statements with fraud, oppression, actual malice, malicious intent, and with intent to cause the foregoing harm to Mr. Prince and his business. Accordingly, Mr. Prince is entitled to, and should be awarded, punitive damages against each of the Defendants.

145.    Mr. Prince has suffered defamation with special damages in that he has suffered losses of an economic and pecuniary nature, separate and apart from the libelous nature of the words used in the Story.

## REQUEST FOR RELIEF

WHEREFORE, Mr. Prince respectfully prays for damages and the entry of judgment on a joint and several basis, on his claims against the Defendants as follows:

      a.    An award of compensatory and punitive damages for the tortious and unlawful conduct of the Defendants as set forth herein;

      b.    An award of reasonable attorney fees, costs and expenses for this action;

      c.    An award of pre- and post-judgment interest; and

      d.    Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38 Plaintiff requests a trial by jury.

Dated: November 7, 2022

Respectfully submitted,

*/s/  Matthew L. Schwartz*

Matthew L. Schwartz
Lauren M. Goldman
Sabina Mariella
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Tel.: (212) 446-2300
mlschwartz@bsfllp.com

Joseph F. Kroetsch
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel.:  (914) 749-8200
jkroetsch@bsfllp.com

*Counsel for Plaintiff Erik Prince*