UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ERIK PRINCE,

                    Plaintiff,

-against-

THE INTERCEPT, et al.,

                    Defendants.

21-CV-10075 (LAP)

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

     Before the Court is Defendants First Look Media Works, Inc. n/k/a First Look Institute, Inc. ("First Look") and Matthew Cole's (together, the "First Look Defendants" or "Defendants") second motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and New York's "anti-strategic litigation against public participation" ("anti-SLAPP") statute, New York Civil Rights Law § 76-a.[1] Plaintiff Erik Prince opposes the motion.[2] For the reasons stated below, Defendants' motion to dismiss is GRANTED.

---

[1] (See Notice of Mot., dated Nov. 21, 2022 [dkt. no. 41]; see also Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pl.'s Amended Compl. ("Def. Br."), dated Nov. 21, 2022 [dkt. no. 42]; Reply in Supp. of Mot. to Dismiss Pl.'s Am. Compl. ("Def. Reply"), dated Dec. 12, 2022 [dkt. no. 44].)

[2] (See Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Am. Compl. ("Pl. Opp."), dated Dec. 5, 2022 [dkt. no. 43].)

I.   **Procedural History**

Plaintiff filed suit against Defendants in this District on November 24, 2021, asserting claims for defamation per se and defamation per quod. (See dkt. no. 1.) The First Look Defendants moved to dismiss Plaintiff's complaint for failure to state a claim on February 11, 2022. (See dkt. no. 15.) Plaintiff opposed, (see dkt. no. 29), and on October 6, 2022, the Court filed an opinion resolving Defendants' motion, (see dkt. no. 38 ("October 2022 Op.")).

In the October 2022 Op., the Court found that Plaintiff is a limited-purpose public figure. (Id. at 38.) Thus, for Plaintiff to plead defamation properly under New York law, he had to allege plausibly that Defendants acted with actual malice. (Id.) On this point, the Court held that Plaintiffs' "nonconclusory allegations against Defendants d[id] not raise a plausible inference of actual malice," (id. at 46), and dismissed Plaintiffs' complaint while granting leave to amend, (id. at 48-50). On November 7, 2022, Plaintiff filed his Amended Complaint, (see dkt. no. 39 ("AC")), and on November 21, 2022, Defendants filed their second motion to dismiss.

In the October 2022 Op., the Court found the following actual malice allegations were insufficient to meet the plausibility pleading standard. "Defendants (1) relied entirely on anonymous sources; (2) failed to include information

2

regarding their anonymous sources in violation of
The Intercept's policies and procedures; (3) deliberately
avoided the truth because Plaintiff's counsel denied Defendants'
allegations, and Defendants refused to engage with Plaintiff by
providing additional details regarding their allegations; and
(4) harbored a political bias against Plaintiff." (See October
2022 Op. at 42 (citations omitted).) In his AC, Plaintiff
attempts to allege new facts to support the plausible inference
that Defendants' actions meet the actual malice standard.

## II.  **Factual Background**[3]

### A.   **The Parties**

This action was initiated by Plaintiff Erik Prince, an
American businessman and former U.S. Navy SEAL officer who
gained notoriety for founding the private military company
Blackwater and who served as an executive Director and Vice
Chairman of Frontier Services Group, which provides "integrated
security, logistics, insurance, and infrastructure services for
clients operating in frontier markets." (AC ¶ 13.) Plaintiff is
also well-known for his involvement in politics, particularly in
the Trump administration. (See October 2022 Op. at 3.)

---

[3] Many of the underlying facts in this case were set out in the
Court's October 2022 Op. Accordingly, in this opinion, the Court
will only state those facts necessary to resolve the dispositive
question: whether Plaintiff has alleged sufficient facts to
support a plausible inference of Defendants' actual malice.

In this action, Plaintiff has sued Defendant First Look, a media company, founded by Pierre Omidyar (founder of eBay), that owns and operates the online nonprofit news publication The Intercept, (AC ¶ 26), and Defendant Matthew Cole, a national security reporter for The Intercept who Plaintiff alleges coauthored the article that is the basis for Plaintiff's defamation claim, (id. ¶ 16). The Intercept is funded by Mr. Omidyar and reader donations. (Id. ¶¶ 26, 30-31.)

### B. __The Alleged Defamation__

Plaintiff claims that an August 13, 2020 article (dkt. no. 17-1, the "Article"), coauthored by Cole and published by The Intercept, defamed Plaintiff by portraying him as meeting "'with a top official of Russia's Wagner Group[4] and offer[ing] his mercenary forces to support the firm's operations in Libya and Mozambique.'" (AC ¶ 4.) Specifically, Plaintiff alleges that Defendants published seven defamatory statements of fact in the Article, including that Plaintiff:

    a. "Offered Lethal Services To Sanctioned Russian Mercenary Firm Wagner;"
    b. "sought in recent months to provide military services to a sanctioned Russian mercenary firm in at least two African conflicts;"

---

[4] The Article described the Wagner Group as "a semi-private military force that operates in countries or conflicts where the Russian government seeks plausible deniability for its activities. It is often equipped and supported directly by the Russian Ministry of Defense . . . ." (Article at 2.)

      c. "met earlier this year with a top official of Russia's Wagner Group;"

      d. "met with Wagner leadership;"

      e. "offered his mercenary forces to support the [Wagner Group's] operations in Libya and Mozambique;"

      f. sought to assist the Russian military by providing "a force in Mozambique;" and

      g. "sent a proposal to the Russian firm offering to supply a ground force as well as aviation-based surveillance."

(Id. ¶ 66.)

Plaintiff alleges that he never: (1) met with "any representative of the Wagner Group;" (2) "offered his services to support the Wagner Group's operations in Libya and Mozambique;" or (3) "sent Wagner Group a proposal to offer his services" in Libya and Mozambique. (Id. ¶ 70.) Plaintiff also denies "caus[ing] any third party to meet with or submit a proposal to the Wagner Group on his behalf." (Id.) Because Plaintiff's counsel told Cole that Plaintiff did not meet with representatives of the Wagner Group prior to the Article's publication, Plaintiff contends that Defendants published the statements with knowledge of their falsity. (Id. ¶¶ 82-86.) Defendants included Plaintiff's denial in the Article. (See Article at 2.) Rather than engage with Plaintiff about the details of their allegations, Plaintiff alleges that Defendants published each of the disputed statements based on anonymous sources. (AC ¶¶ 82-88.)

Plaintiff contends that the Article accuses him of being "a criminal and disloyal to his nation" by claiming that he

"engaged in illegal conduct and violated U.S. and U.N. sanctions and U.S. arms trafficking regulations by allegedly soliciting business from Wagner Group." (Id. ¶ 116.) These allegations have allegedly caused substantial harm and special damages to Plaintiff in the form of, among other things, monetary loss, injury to reputation and good will, and loss of profits. (Id. ¶ 117.) The Article was subsequently republished by news outlets including, but not limited to, the Daily Beast, The Intellectualist, and The Moscow Times. (Id. ¶¶ 90-95.)

## C.   Factual Allegations of Actual Malice

Plaintiff asserts that his AC "cures any deficiency" that the Court found in his original complaint by "including extensive additional factual material about Defendants' bias and political agenda, and its knowing reporting of false information about Mr. Prince." (Pl. Opp. at 1.) Regarding actual malice, Plaintiff alleges that Defendants' publishing the Article was part of a "concerted effort" to discredit him by "publishing false or misleading statements about him and his business in The Intercept in order to boost The Intercept's readership, appease its leadership's well-documented dislike of Mr. Prince, gain notoriety, and profit at Mr. Prince's expense." (AC ¶ 1.)[5]

---

[5] As support for this allegation, Plaintiff cites a list of articles the Intercept has published over "several years" covering Plaintiff that feature unflattering headlines. (AC ¶ 9.)

### i. **Allegations of "Reckless and Biased Journalism" at The Intercept**

Plaintiff alleges that The Intercept "has a history of reckless and biased journalism" and "knowingly and recklessly cultivated a culture that rejects accountability for bad journalism." (Id. ¶¶ 32, 35.) To support this allegation, Plaintiff alleges that in 2016, a journalist at The Intercept engaged in a "pattern of deception" that required The Intercept to correct five stories and retract one. (Id. ¶ 32.) Plaintiff also alleges that in 2017, The Intercept and Cole sent a document provided by one of their sources to the NSA for identification, resulting in the source's arrest and incarceration. (Id. ¶ 33.) Plaintiff alleges that Laura Poitras, an Intercept co-founder, was fired two weeks after she publicly criticized The Intercept's failure to protect its source. (Id. ¶ 35.) Plaintiff quotes Poitras as saying that Betsy Reed, The Intercept's editor-in-chief at the time the Article was published, oversaw the reporting on the NSA leak, directed the investigation into The Intercept's failure to protect its source, and removed a staff person from the investigation when the facts suggested that editorial failures were responsible for the failure. (Id.)

Plaintiff makes several allegations regarding The Intercept's bias toward the political left. Plaintiff begins

by detailing Omidyar's political donations and statements against Donald Trump and his connections to the Democratic Party. (Id. ¶¶ 27-28.) As further evidence of bias, Plaintiff points to comments made by Glenn Greenwald, another Intercept co-founder, who said he resigned because The Intercept censored an article he wrote that was critical of President Biden. (Id. ¶ 36.) Greenwald blamed The Intercept's failure to protect its source in the NSA story and the censuring of his article on Intercept editors' "overarching need to secure the approval and admiration of" mainstream media outlets and liberal political interests. (Id. ¶¶ 34, 37.)

### ii. Allegations of The Intercept's Bias Against Plaintiff

Plaintiff alleges that Defendants defamed him due to the bias that both Cole and Jeremy Scahill, The Intercept's sole remaining co-founder, have against him. (AC ¶ 8.) First, Plaintiff alleges that The Intercept has had a "history of false reporting" against him, citing "over a dozen inaccurate stories" published between 2014 and the present, "almost all" of which were written by Cole and Scahill. (Id. ¶¶ 42-43.) Plaintiff goes on to share a list of quotes from these articles that he alleges are false or not accurate. (Id. ¶¶ 44-52.)

Second, Plaintiff alleges that Scahill "constantly" discusses him in a "biased, derogatory, and false light" on

The Intercept's podcast, "Intercepted,"[6] and quotes a review of a
book Scahill wrote about Plaintiff's former business,
Blackwater, that says "Scahill's vitriol discredits him and any
reasonable argument he otherwise presents regarding the dangers
posed by Blackwater and its sister companies." (Id. ¶ 53.)
Plaintiff alleges that Reed worked with Scahill on his reporting
regarding Plaintiff, edited Scahill's Blackwater book, and
appeared on the Intercepted podcast to discuss Plaintiff with
Scahill, where she once "echoed" Scahill's negative statements
against Plaintiff and "noted Scahill's obsession with
[Plaintiff] by calling him Scahill's 'white whale.'" (Id. ¶ 58.)

Third, Plaintiff alleges that Cole has appeared on the
Intercepted podcast to discuss him with Scahill and has
"pandered to Scahill's hatred" of him. (Id. ¶¶ 56-57.) Plaintiff
asserts that these factual allegations demonstrate Cole's
awareness of Scahill's strong dislike for him and
The Intercept's awareness that Cole would adopt Scahill's bias
against him. (Id. ¶ 56.)

### iii. Allegations of Flaws in the Reporting Process for the Article

Plaintiff alleges that Defendants' use of "unsubstantiated
claims by anonymous sources" failed to amount to the "basic

---

[6] In support of this allegation, Plaintiff quotes a list of
"inaccurate and inflammatory comments" that he alleges Scahill
made about him on the Intercepted podcast. (AC ¶¶ 54-55.)

factual inquiry common among all responsible news organizations"
and represented an "obvious and intentional disregard for the
truth." (AC ¶ 10.) Plaintiff alleges that The Intercept
frequently relies on anonymous sources for its reporting "who
not only decline to go on record, but who also do not disclose
their identities to The Intercept." (Id. ¶ 39.) In support of
this allegation, Plaintiff alleges that The Intercept uses a
server that allows individuals to send messages and documents to
its reporters without disclosing their identities and suggests
that tipsters use Signal, a secure messaging application, to
send encrypted messages to The Intercept. (Id.) Plaintiff
alleges that The Intercept's use of anonymous sources in the
Article violated The Intercept's policy to "supply readers with
as many details as possible to contextualize and establish the
credibility of anonymously sourced information without
compromising the source." (Id. ¶ 40 (internal quotation marks
and citations omitted).)

Plaintiff further alleges that based on the "total absence
of context in violation of The Intercept's policies," and
The Intercept's "practice of accepting entirely anonymous
information," it is "reasonable to infer" that "even the
Defendants did not know the identity or bona fides of its
anonymous sources." (Id. ¶ 76.) Plaintiff alleges that
Defendants' failure in the Article to describe its anonymous

10

sources and evidence "in a general manner so that readers can form a view as to whether or not to credit the allegations" was a departure from The Intercept's practice in prior articles reporting on Plaintiff. (Id. ¶¶ 77-79.) From this, Plaintiff alleges that the sources for the Article

> lacked credibility (or were anonymous to even the Defendants, meaning that they had no ability to vet their credibility), and the Defendants either fabricated the Story or, at a minimum, knew that there was no information that they could provide in the Story to establish the credibility of the sources to readers.

(Id. ¶ 80.)

Plaintiff alleges that Defendants "blindfolded themselves to the truth" by relying on anonymous sources and failing to provide Plaintiff sufficient details regarding the sources and the alleged Wagner meetings to allow him to disprove Defendants' allegations. (Id. ¶¶ 6-7.) Plaintiff alleges that Defendants knew their allegations were false or that Defendants entertained serious doubts about the veracity of their allegations because Plaintiff's counsel told Defendants the allegations were false before they published the Article. (Id. ¶ 6.) Plaintiff alleges that in this pre-publication communication, his counsel requested more details about the alleged Wagner meeting so that Plaintiff could demonstrate that the meeting did not happen, but Cole did not respond to this request. (Id. ¶ 84.) Plaintiff alleges that The Intercept's "complete stonewalling" of

Plaintiff further deviated from its practice in its prior reporting on him, where previously The Intercept had made "serious attempts to engage with Mr. Prince in a manner that conveyed information with which he could specifically refute the allegations." (Id. ¶ 87.) Plaintiff alleges that Defendants' refusal to provide him with sufficient information to refute their allegations "reflects Defendants' knowledge of the probable falsity" of the Article. (Id. ¶ 87.) Plaintiff further alleges that Defendants' statements regarding his supposed outreach to the Wagner Group were "inherently improbable" because Defendants had previously reported Plaintiff's criticisms of Russia's involvement in Libya. (Id. ¶¶ 71-72.)[7]

Plaintiff alleges that post-publication, his counsel continued to: 1) communicate to Defendants that the Article was false and defamatory; 2) request that Defendants provide Plaintiff with details regarding the Wagner meeting and their sources so he could respond to the allegations in the Article; and 3) request that Defendants retract the Article. (Id. ¶¶ 103-10, 112.) Defendants declined Plaintiff's requests. (Id. ¶¶ 106-08, 110, 113.)

---

[7] Plaintiff quotes a 2019 article written by Cole in which Cole wrote that Plaintiff had warned the CEO of a Russian sovereign wealth fund that "the U.S. could not accept Russian involvement in Libya" and an episode of the Intercepted podcast where Cole and Scahill characterized Plaintiff as saying, "the Russians have to stay out of Libya." (Id. ¶ 72.)

### III. **Legal Standards**

#### A.   **Fed. R. Civ. P. 12(b)(6)**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" In re Actos End-Payor Antitrust Litig., 848 F.3d 89, 97 (2d Cir. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. That "standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Palin v. N.Y. Times Co., 940 F.3d 804, 810 (2d Cir. 2019). Evaluating "whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

When considering a motion to dismiss, the Court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences" in the plaintiff's favor. Dane v. UnitedHealthcare Ins. Co., 974 F.3d 183, 188 (2d Cir. 2020) (cleaned up).  The Court is not required, however, "to credit conclusory allegations or legal conclusions couched as factual allegations." Id. (ellipsis omitted). "Accordingly, threadbare

13

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (cleaned up).

In determining the sufficiency of a claim under Rule 12(b)(6), the court may review only the complaint, documents attached to the complaint or incorporated into it by reference, and documents "integral" to the plaintiff's allegations, even if not explicitly incorporated by reference. Biro v. Conde Nast (Biro I), 883 F. Supp. 2d 441, 455 (S.D.N.Y. 2012); see id. (noting that in a defamation action, these documents typically include "the documents containing the allegedly defamatory statements").

The court may also review documents subject to judicial notice. The Court of Appeals has explained, "[a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) (quoting Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998)).

**B.    Defamation Generally[8]**

"Defamation is the injury to one's reputation, either by written expression (libel) or oral expression (slander)." <u>Penn Warranty Corp. v. DiGiovanni</u>, 10 Misc. 3d 998, 1002 (Sup. Ct. N.Y. Cty. 2005) (citing <u>Morrison v. Nat'l Broad. Co.</u>, 19 N.Y.2d 453 (N.Y. 1967)). "The elements of a cause of action for defamation are a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se." <u>Kamchi v. Weissman</u>, 125 A.D.3d 142, 156, 1 N.Y.S.3d 169, 180 (2nd Dep't 2014) (internal quotation marks and citation omitted).[9]

"The showing of fault necessary to recover for libel varies depending on a plaintiff's position in society, requiring a higher degree of fault for public officials and public figures." <u>Celle v. Filipino Rep. Enters. Inc.</u>, 209 F.3d 163, 176 (2d Cir. 2000). The First Amendment "bars a public figure from recovering damages in a libel action unless clear and convincing evidence

---

[8] In the October 2022 Op., the Court conducted the choice-of-law analysis that is required under federal diversity jurisdiction and ruled that New York state law governs the case at hand. (October 2022 Op. at 21-28.) The Court maintains this ruling here.

[9] <u>See also</u> <u>Franklin v. Daily Holdings, Inc.</u>, 135 A.D.3d 87, 91, 21 N.Y.S.3d 6, 3 (1st Dep't 2015) (applying the elements of defamation to libel claims).

proves that a false and defamatory statement was published with
'"actual malice"—that is, with knowledge that it was false or
with reckless disregard of whether it was false or not.'" Kipper
v. NYP Holdings Co., 12 N.Y.3d 348, 353-54 (N.Y. 2009) (quoting
N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)). New
York's amended anti-SLAPP law also applies the actual malice
standard to any "action involving public petition and
participation," including:

> (1) any communication in a place open to the
> public or a public forum in connection with an
> issue of public interest; or
>
> (2) any other lawful conduct in furtherance of
> the exercise of the constitutional right of
> free speech in connection with an issue of
> public interest, or in furtherance of the
> constitutional right of petition.

N.Y. Civ. Rights Law § 76-a(1)(a). Further, the law states that
the term "public interest" is to "be construed broadly, and
shall mean any subject other than a purely private matter." Id.
at § 76(1)(d).

C. **Defamation Against a Public Figure: Actual Malice**

The actual malice standard requires that the plaintiff
shows the defendant made the statements at issue "with knowledge
that the statements were false or with reckless disregard as to
their falsity." Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir.
2015); see also McDougal v. Fox News Network, LLC, 489 F. Supp.
3d 174, 185 (S.D.N.Y. 2020). The Supreme Court has clarified

that although "the concept of 'reckless disregard' cannot be fully encompassed in one infallible definition, . . . the defendant must have made the false publication with a high degree of awareness of . . . probable falsity, or must have entertained serious doubts as to the truth of his publication." Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 667 (1989) (internal quotation marks, citations, and alterations omitted). The reckless conduct needed to show actual malice "'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing,' but by whether there is sufficient evidence 'to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" Church of Scientology Int'l v. Behar, 238 F.3d 168, 174 (2d Cir. 2001) (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)).

The Supreme Court has found the following factors are relevant in showing that the defendant harbored actual malice:

> (1) whether a story is fabricated or is based wholly on an unverified, anonymous source, (2) whether the defendant's allegations are so inherently improbable that only a reckless person would have put them in circulation, or (3) whether there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

Id. (citing St. Amant, 390 U.S. at 732).

To survive a motion to dismiss, "malice must be alleged plausibly in accordance with Rule 8." Biro, 807 F.3d at 545.

Therefore, "a public-figure plaintiff must plead plausible
grounds to infer actual malice by alleging enough facts to raise
a reasonable expectation that discovery will reveal evidence of
actual malice." Id. at 546 (cleaned up); see id. at 545-46
(noting that courts in this Circuit "have inferred actual malice
at the pleading stage"). For defamation claims against
organizational defendants, "the state of mind required for
actual malice would have to be brought home to the persons in
the [defendant] organization having responsibility for the
publication" of the statements at issue. Sullivan, 376 U.S. at
287.

### IV.   Discussion

####   A.   Defendants' Bias Against Plaintiff and History of Reckless Journalism

#####        i.   Legal Standards

A complaint that alleges a defamation defendant harbored
ill will toward the plaintiff can "provide[] no basis for
plausibly inferring that the [defendant] had any doubts about
the truth" of the challenged statements. Brimelow v. N.Y. Times
Co., 21-66-cv, 2021 WL 4901969, at *3 (2d Cir. Oct. 21, 2021)
(citing Behar, 283 F.3d at 174). "Despite its name, the actual
malice standard does not measure malice in the sense of ill will
or animosity, but instead the speaker's subjective doubts about
the truth of the publication." Behar, 283 F.3d at 174. Indeed,

18

> "[t]he fairness of the broadcast is not at issue in the
> libel suit. Publishers and reporters do not commit a
> libel in a public figure case by publishing unfair one-
> sided attacks. The issue in the libel suit is whether
> the publisher recklessly or knowingly published false
> material. The fact that a commentary is one sided and
> sets forth categorical accusations has no tendency to
> prove that the publisher believed it to be false."

Biro v. Condé Nast (Biro II), 963 F. Supp. 2d 255 (S.D.N.Y.
2013) (quoting Westmoreland v. CBS Inc., 601 F. Supp. 66, 68
(S.D.N.Y. 1984)). Allegations about "improper political or
personal biases do not establish actual malice without
additional facts to suggest the speaker acted pursuant to that
bias." McDougal v. Fox News Network, LLC, 489 F. Supp. 3d 174,
185 (S.D.N.Y. 2020) (citing Palin, 940 F.3d at 814 (requiring
more than "sheer political bias" to establish actual malice);
Harte-Hanks, 491 U.S. at 665 ("[A] newspaper's motive in
publishing a story—whether to promote an opponent's candidacy or
to increase its circulation—cannot provide a sufficient basis
for finding actual malice.").

### ii.  **Analysis**

Plaintiff argues that he has alleged sufficient facts
regarding Cole's bias to support the inference that Cole wrote
the alleged defamatory statements with actual malice. (Pl. Opp.
at 6.) Plaintiffs' allegations regarding Cole's bias include
quotes from six other articles Cole wrote about him that
Plaintiff alleges are all false and reflect Cole's "disdain" and

"raw personal contempt" for him. (Id. at 7 (citing AC ¶¶ 42-52).) Plaintiff further alleges that Scahill is biased against him and that Cole faced "managerial pressures to further the political agendas and personal grudges of Cole's colleagues and superiors." (Id. (citing AC ¶¶ 52-59).) Finally, Plaintiff alleged that there was a "culture at The Intercept that willingly sacrificed accountability and journalistic integrity for political expediency," allowing Cole to act pursuant to his bias. (Id. at 7, 10 (citing AC ¶¶ 53-58).)

Defendants first assert that "generalized allegations of bias" are insufficient to establish actual malice. (Def. Br. at 4 (citing Brimelow, 2021 WL 4901969, at *3).) In the same vein, Defendants contend that Plaintiff's allegations of bias pertaining to Scahill and others not involved in the reporting or writing of the Article are irrelevant to the actual malice analysis. (Def. Br. at 5 (citing Sullivan, 376 U.S. at 287).) Defendants extend this argument to Plaintiff's allegations regarding unrelated incidents of journalistic failures by another Intercept employee in 2016 and Cole's failure to protect a source in 2017. (Def. Br. at 12-13.)

Defendants then reject Plaintiff's use of The Intercept's prior reporting to support a finding of actual malice. Defendants argue that Plaintiff's allegations do not feature "any particular statements of defamatory fact" that were

20

"knowingly false." (Def. Br. at 5.) Defendants point out that Plaintiff does not claim that he contacted Defendants to try to correct these statements or that he threatened to sue over them. (Id.) Defendants argue that taking an adversarial stance is not indicative of actual malice. (Id. at 6 (quoting Tavoulareas v. Piro, 817 F.2d 762, 795 (D.C. Cir. 1987) (en banc) and Westmoreland, 601 F. Supp. at 68).)

Plaintiff cites McDougal and Celle for the proposition that "allegations of political and personal biases against a subject of reporting, with the addition of 'facts to suggest the speaker acted pursuant to that bias,' can lead to an inference of actual malice." (Pl. Opp. at 6.) However, in McDougal, the Court rejected McDougal's defamation claim against the defendant, Fox News Network, LLC ("Fox"). 489 F. Supp. 3d at 188. McDougal sued Fox due to statements made by its then-employee, Tucker Carlson, accusing her of extorting Donald Trump over an affair Trump had had with McDougal. Id. at 178-79. McDougal argued that she had sufficiently pled actual malice based on her allegations that Carlson was personally and politically biased in Trump's favor. Id. at 185. The Court wrote that McDougal's actual malice allegations were "pure speculation, supported not by facts but by only conclusory statements." Id. The Court found that McDougal's allegation of a personal relationship between Carlson and Trump, which was "evidenced by 47 Twitter posts (positive

tweets by Trump about Carlson)," was insufficient, and found that McDougal's allegation that Carlson "had a pre-determined narrative based on his political bias" was conclusory. Id. at 186.

As part of its analysis, the Court distinguished McDougal's insufficient allegations from the allegations the Court of Appeals found sufficient in Palin. Id. at 185-86. The Court wrote that in Palin, the author of the allegedly defamatory editorial "repeated a long-debunked claim" while in possession of "direct knowledge" that the claims had been debunked and that both the author and his brother, United States Senator Michael Bennet, had been "active advocates for gun control, opposed to Palin's political activities." McDougal, 489 F. Supp. 3d at 186 (citing Palin, 940 F.3d at 809-15). The Court summarized the Palin decision as endorsing a "'bias' theory based on factual assertions and, then, only in conjunction with an allegation that the speaker otherwise had knowledge of the falsity of his statements." McDougal, 489 F. Supp. 3d at 187.

In Celle, the Court of Appeals upheld in part a jury verdict finding that the defendant, Libertito Pelayo, had defamed the plaintiff, Lino Celle. 209 F.3d at 191. The Court of Appeals wrote that Pelayo and Celle "share[d] a disaffection for one another resulting in part from their operation of competing media for the Metropolitan Filipino-American community." Id. at

22

172. This disaffection was evidenced in Pelayo and Celle's trading slanted and negative headlines about each other and their families in their respective publications. Id. at 172, 186-87. Thus, in both Celle and Palin, the Court of Appeals held that where the plaintiffs had alleged: 1) personal relationships with the defendants that fueled the defendants' bias against them; and 2) other evidence of the defendants' knowledge of the falsity of their statements or defendants' entertaining serious doubts as to the truth of the statements; together, those allegations were enough to support a finding of actual malice.

In this case, Plaintiff has failed to allege any sort of personal relationship with Cole, the author of the Article. Just as in McDougal, where the Court found Trump's positive tweets about Carlson failed to raise the inference of a personal relationship between the two, the Court finds that the series of articles written by Cole about Plaintiff, (AC ¶¶ 42-52), do not raise an inference of a personal relationship between Plaintiff and Cole. Plaintiff's further assertions regarding Cole's disdain for him, (Pl. Opp. at 7), are similarly insufficient to raise an inference of actual malice. As in Westmoreland, the fact that Cole's reporting on Plaintiff is one sided and sets forth categorical accusations has "no tendency to prove" that Cole believed his reporting was false. 601 F. Supp. at 68. Perhaps more importantly, Plaintiff here fails to allege other

evidence of Defendants' knowledge of the falsity of their statements or Defendants' entertaining serious doubts as to the truth of the statements as in <u>Palin</u> and <u>Celle</u>.

Though Plaintiff includes allegations of Scahill's bias, allegations of actual malice must be specific to the person within The Intercept who was responsible for reporting and writing the Article. <u>See</u> <u>Sullivan</u>, 376 U.S. at 287. Plaintiff argues that his allegations of Scahill's bias go to Cole's motive to defame him. (Pl. Opp. at 8.) However, Plaintiff's allegations do not amount to anything more than evidence of Cole and Scahill's political opposition to Plaintiff's work. The Court of Appeals has found that political opposition is not sufficient on its own to support an inference of actual malice. <u>Palin</u>, 940 F.3d at 814. None of Plaintiff's allegations support the inference that Cole was pressured to produce "sensationalistic or high-impact stories with little or no regard for their accuracy." <u>Tavoulareas</u>, 817 F.2d at 796–97. Thus, despite Scahill's alleged influence over Cole, Plaintiff's allegations of Cole and Scahill's political bias are not enough to raise a plausible inference of actual malice.

Plaintiff's allegations of journalistic failures at The Intercept fare no better. (Pl. Opp. at 10.) Plaintiff makes allegations regarding two incidents. The first occurred in 2016 when The Intercept found that one of its journalists engaged in

24

a "pattern of deception." (AC ¶ 32.) Once The Intercept discovered the deception, the organization corrected five stories and retracted one. (Id.) These allegations involve a journalist who did not work on the Article at issue and an incident that preceded the Article's publication by about four years. The allegations show The Intercept responded to this "pattern of deception" by taking steps one would expect of a news organization concerned with the truth of its reporting – issuing corrections and retractions to rectify discovered falsities. If anything, these allegations undercut the inference that Cole was subject to managerial or cultural pressures to produce stories with "little or no regard for their accuracy."

The second incident occurred in 2017, when Cole failed to protect the identity of a source. (AC ¶ 33.) Cole allegedly sent a copy of a document given to him by his source to the NSA with identifying markings, identified his source to the NSA, and revealed the document's postmark to the NSA. (Id.) These allegations do not support the inference that Cole published the Article at issue with knowledge of its falsity or serious doubts as to its truth. Rather, these allegations show Cole's being overzealous in confirming his source's information. If anything, this portrayal of Cole's newsgathering practices cuts against Plaintiff's other allegations that Cole relied on anonymous sources for the Article without investigating them sufficiently.

25

See Section IV(D), infra. In summary, Plaintiff's allegations of biased and reckless journalism do not support an inference that Cole acted with actual malice in writing the Article.

### B.  Defendants' Contradictory Previous Reporting

A defamation defendant's profession of good faith will be unlikely to prevail when "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation." St. Amant, 390 U.S. at 732. Plaintiff argues that Cole wrote the allegedly defamatory statements with actual malice because, based on Plaintiff's background and The Intercept's prior reporting on him, Defendants should have known the defamatory statements were "inherently improbable." (Pl. Opp. at 10.) Specifically, Plaintiff alleges that Defendants previously reported that he had been critical of Russia's involvement in Libya, making it inherently improbable that he would then offer to assist the Wagner Group's involvement there. (Id. at 10-11 (citing AC ¶¶ 5, 13, 71-72, 81).) Plaintiff alleges that during a meeting with the CEO of a Russian sovereign wealth fund in 2017, he told the CEO that "the United States could not accept any Russian involvement in Libya because it would make the situation there much worse." (AC ¶ 71.) Plaintiff then alleges that Defendants knew of his 2017 statements because they reported on them when they were released in 2019 as part of the Mueller Report. (Id. ¶ 72.)

Defendants write that Plaintiff's 2017 statements do not render inherently improbable Defendants' reporting on his meeting with Wagner, which they assert took place four years later and in a different political context. (Def. Br. at 8.) Defendants point out that Plaintiff's allegations demonstrate Defendants did not ignore or conceal Plaintiff's prior statements; it reported on them. (Def. Reply at 3 (citing AC ¶ 72).)

Plaintiff cites Stern v. Cosby, 645 F. Supp. 2d 258 (S.D.N.Y. 2009), in support of his argument that Defendants' allegations are inherently improbable. Stern concerned an allegation of defamation by Howard K. Stern, the former lawyer and companion of Anna Nicole Smith, against Rita Cosby, the author of a book about Smith's death. Id. at 263. In her book, Cosby wrote that Stern and Larry Birkhead, Smith's former boyfriend and the father of one of her children, id. at 265, "had oral sex at a party at a private home in Los Angeles. Smith discovered them, laughed, and later remarked that Stern was gay," id. at 267. The Court found it to be inherently improbable that Stern and Birkhead, two men who maintained that they were heterosexual and were "key players in the tabloid drama that was Smith's life," had sex in a bedroom at a party in a stranger's house in Los Angeles "precisely when" Smith was walking around the house and entering bedrooms. Id. at 279.

27

The allegations here are more akin to those in Jankovic than Stern. In Jankovic, the plaintiff sued the International Crisis Group ("ICG"), a non-profit organization dedicated to preventing and resolving deadly conflict, for a statement in one of its reports linking him to the Slobodan Milosevic regime in Serbia which "carried out a pattern of ethnic violence in the Serbian province of Kosovo." Jankovic v. Int'l Crisis Grp., 822 F.3d 576, 582-83 (D.C. Cir. 2016). The plaintiff argued that due to his later "outspoken" support of Prime Minister Zoran Djindjic, who "favored sweeping changes of Milosevic's policies" and extradited Milosevic to The Hague to stand trial for war crimes, it was inherently improbable that he would have previously been a Milosevic supporter. Id. at 583, 595. The court held that this was a "false dichotomy" because it was "neither unheard of for a former Milosevic supporter to shift alliances . . . nor that anyone at ICG thought this possibility particularly unlikely." Id. at 595.

In this case, Defendants reported in 2019 on a 2017 statement Plaintiff made to the CEO of a Russian sovereign wealth fund that "the U.S. could not accept Russian involvement in Libya." (AC ¶ 72.) In the same 2019 article, Defendants wrote that Plaintiff had "spent years offering his paramilitary services in Libya" and was "incensed" at the news that a Russian aircraft carrier was moving off the Libyan coast. (Id.)

Defendants assert that any differences in their reporting on
Plaintiff's statements and actions four years later merely
tracked his "evolving business interests and political standing"
in a "different political context." (Def. Br. at 8.) These facts
are similar to those in Jankovic, concerning alliances or
opinions that can shift over time. The possibility that
Plaintiff's opinions and interests shifted over several years
and under changing circumstances makes the allegations in Cole's
Article plausible, not inherently improbable. Thus, Plaintiff's
2017 statements do not make it inherently improbable that
Plaintiff would meet with or offer services to the Wagner Group
in 2021.

### C.   Defendants' Failure to Share Sufficient Details to Allow Plaintiff to Disprove the Article

#### i.   Legal Standard

"[A] public figure plaintiff must prove more than an
extreme departure from professional standards" to establish
actual malice. Harte-Hanks, 491 U.S. at 665; see also Jankovic,
822 F.3d at 595 ("[P]urported deviations from [] normal
operating procedures" are not "suggestive of actual malice" and
"do[] not amount to purposeful avoidance of the truth.")
(citation and quotation marks omitted). "Although failure to
investigate will not alone support a finding of actual malice,
the purposeful avoidance of the truth is in a different

category." Harte-Hanks, 491 U.S. at 692 (citing St. Amant, 390 U.S. at 731, 733). A reporter's choice to include "some information and not other information" may amount to "no more than minor omissions in investigation, from which no inference of purposeful avoidance of the truth could reasonably be drawn." Behar, 238 F.3d at 175 (citation and quotation marks omitted).

Actual malice "cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." Edwards v. Nat'l Audubon Soc'y, 556 F.2d 113, 121 (2d Cir. 1997). Relatedly, a defendant's "failure to verify statements with the plaintiff . . . do[es] not amount to reckless disregard of the truth." Loeb v. News Times Comm'cns Corp., 497 F. Supp. 85, 93 (S.D.N.Y. 1980) (citing St. Amant, 390 U.S. at 730); see also Coliniatis v. Dimas, 965 F. Supp. 511, 518 (S.D.N.Y. 1997) (defendants' failure to contact plaintiff until day before publication was not "indicative of an intent to avoid the truth").

## ii.  Analysis

Plaintiff argues that Defendants' process in reporting the Article allowed them purposefully to avoid the truth. (Pl. Opp. at 15.) Specifically, Plaintiff asserts that Defendants' failure to share details with him regarding his alleged meeting with the

Wagner Group made it impossible for him to verify or disprove
Defendants' allegations. (Id. (citing AC ¶¶ 83-85).) Plaintiff
writes that "Defendants knowingly refused to allow the subject
of their reporting to provide them with facts, thereby
blindfolding themselves to learning the truth." (Id. at 16.)
Plaintiff further asserts that by seeking comment from him,
Defendants crossed the line from negligence to recklessness.
(Id.) Plaintiff reasons that the fact that Defendants contacted
him before publishing the Article shows that Defendants knew
they were "departing from the standard of care necessary to know
the truth of the allegations they would publish" by failing to
tell him enough facts to verify the story. (Id.)

Defendants contend that contacting Plaintiff's counsel,
reporting Plaintiff's denial of the Article's allegations, and
declining to provide source-identifying details to Plaintiff
cannot amount to purposeful avoidance of the truth. (See Def.
Br. at 10-11; Def. Reply at 4.) Indeed, the Court has previously
ruled that denials without more are insufficient to support a
plausible claim of actual malice. (October 2022 Op. at 46
(citing Edwards, 556 F.2d at 121.) Defendants then go further
and argue that their reporting of Plaintiff's denial in their
article should weigh against a finding of actual malice. (Def.
Br. at 10 (citing Contemp. Mission v. N.Y. Times Co., 665 F.
Supp. 248, 270 (S.D.N.Y. 1987) (no actual malice where defendant

"made an attempt to report plaintiffs' side of the story"),
aff'd, 842 F.2d 612 (2d Cir. 1988)).)

Defendants reject Plaintiff's assertion that their seeking
comment from Plaintiff before publication can contribute to an
inference of actual malice. (Def. Br. at 10-11.) Defendants
write that such a ruling would be illogical because if
Defendants had not sought comment at all, that decision would
not have supported an inference of actual malice. (Id. (citing
Loeb, 497 F. Supp. at 93).) Finally, Defendants assert that
their decision not to engage in "protracted sharing of
information" does not give rise to an inference of actual
malice. (Def. Br. at 11 (citing Coliniatis, 965 F. Supp. at
518).)

The facts in Harte-Hanks, a case where the Supreme Court
upheld a jury verdict that the Defendant purposefully avoided
the truth, are instructive. Harte-Hanks concerned a suit by
Daniel Connaughton, an unsuccessful candidate for municipal
judge in Hamilton, Ohio, against Harte-Hanks Communications,
Inc., the publisher of the Journal News, a local newspaper that
supported the reelection of the incumbent municipal judge whom
Connaughton ran against. 491 U.S. at 660. Just before the
election, the incumbent's Director of Court Services was
arrested on bribery charges. A grand jury investigation of the
bribery charges was in progress when the Journal News ran a

32

story quoting Alice Thompson, a grand jury witness, as stating that "Connaughton had used 'dirty tricks' and offered her and her sister jobs and a trip to Florida 'in appreciation' for their help in the investigation." Id.

The most important witness to the bribery charges was Alice Thompson's older sister, Patsy Stephens. Id. at 668. In a tape-recorded interview in Connaughton's home, Stephens explained that she had paid the Court Administrator to dispose of criminal charges against various relatives and acquaintances. Id. Before publishing its article, the managing editor of the Journal News instructed the reporters to interview all the witnesses to the conversation between Connaughton and Thompson except for Stephens. "No one was asked to interview her and no one made any attempt to do so." Id. at 682. The Court noted this omission was "hard to explain" in light of Journal News reporters' repeated questions to Connaughton and Thompson as to whether Stephens would confirm Thompson's allegations. Id. The Court wrote the omission was "utterly bewildering" given the "substantial resources" the Journal News had committed to investigating Thompson's claims. Id. The Court reasoned that:

> if the Journal News had serious doubts concerning the truth of Thompson's remarks, but was committed to running the story, there was good reason not to interview Stephens—while denials coming from Connaughton's supporters might be explained as motivated by a desire to assist Connaughton, a denial coming from Stephens would quickly put an end to the story.

33

Id. The Court also found suspect the Journal News's decision not to listen to the tapes of the interview Stephens recorded in Connaughton's home. Id. at 683. This was despite the fact that Connaughton provided the tapes to the Journal News after its reporters had asked Connaughton if they could listen to them. Id. at 683. The Court also noted that each of the remaining six witnesses to the conversation between Connaughton and Thompson denied Thompson's charges and corroborated Connaughton's version of events. Id. at 682. Weighing these facts and others, the Court wrote that "the conclusion that the newspaper acted with actual malice inexorably follows." Id. at 691.

Comparing the allegations here with the evidence in Harte-Hanks, Plaintiff's allegations regarding Cole's conduct do not rise to the level of purposeful avoidance of the truth. Despite Plaintiff's assertions, he cites no authority for the proposition that reporters must give the subject of their reporting "information upon which to verify [their] allegations" or otherwise expose themselves to an inference of purposeful avoidance of the truth and a finding of actual malice. (Pl. Opp. at 15-16.) Plaintiff does not allege any other specific faults with Cole's reporting process beyond his reliance on anonymous sources, which is also insufficient in itself to raise an inference of actual malice, (see Section IV(D), infra). Reliance on anonymous sources and a refusal to give out information for

verification purposes that could be source-identifying are a far cry from the purposeful avoidance of the truth in Harte-Hank, where the defendant decided not to interview the "most important" witness, 491 U.S. at 668, and published the story despite the uniformly contradictory accounts of six other witnesses, id. at 691. Thus, the Court finds that Plaintiff has failed to allege sufficiently that Cole purposefully avoided the truth in reporting the Article.

### D.   **Defendants' Reliance on Anonymous Sources**

#### i.   **Legal Standard**

"[R]eliance on anonymous sources alone does not support an inference that the publisher acted with actual malice." Cabello-Rondon v. Dow Jones & Co., 720 F. App'x 87, 89 (2d Cir. 2018). "'[R]eliance on anonymous or unreliable sources without further investigation may support an inference of actual malice,' where the plaintiff includes additional allegations to buttress such an inference." Id. (quoting Biro, 807 F.3d at 546). However, where the statements at issue were not based "'wholly' on information from unverified and anonymous sources" or the complaint failed to "allege facts that would have prompted the [] defendants to question the reliability of any of the named or unnamed sources at the time the Article was published," the allegations will "fall short of raising a plausible inference of actual malice." Biro, 807 F.3d at 546.

ii.  **Analysis**

In the AC, Plaintiff wrote that the Intercept used
anonymous sources in reporting the Article. (AC ¶¶ 7, 10, 39-41,
73-80, 104.) Plaintiff alleged that the Intercept frequently
relies on sources that do not disclose their identities even to
the Intercept. (AC ¶ 39.) Further, Plaintiff alleged that the
Intercept's choice to rely exclusively on anonymous sources and
its failure to provide any information about those sources
"lead[s] to the inference that The Intercept itself did not know
who its sources were." (Id. ¶ 41.)

Plaintiff argues that Defendants' reliance on anonymous
sources in writing the Article bolsters his allegations of
actual malice because the allegations regarding Defendants'
anonymous sources are "not standing alone." (Pl. Opp. at 13
(quotation marks and citations omitted).) Plaintiff argues that
he cannot be held accountable for his failure to allege facts
that would have prompted Defendants to question the reliability
of their sources because Defendants' disclosures regarding their
sources did not provide him with sufficient details to allege
flaws in the sources' reliability. (Id.) Plaintiff asserts that
he can allege that Defendants fabricated the Article because the
Defendants did not provide any sources. (Id. at 14.) Plaintiff
contends that Defendants' reference in the Article to "documents

viewed by the Intercept" does not make it less likely that
Defendants fabricated the Article. (Id. at 15.)

Defendants assert that courts "routinely reject arguments
that reliance on confidential sources is evidence of actual
malice." (Def. Br. at 6-7 (citing Cabello-Rondon, 720 F. App'x
at 89 and Biro, 807 F.3d at 546).) Defendants argue that if
their refusal to provide source-identifying information was
sufficient to raise an inference of actual malice, such a ruling
would "gut[]" New York state's public policy granting
journalists a privilege to withhold newsgathering information.
(Id. at 7 (citing N.Y. Civ. Rights Law § 79-h; O'Neill v.
Oakgrove Constr., Inc., 71 N.Y.2d 521, 524 (1988) (holding that
both the New York constitution and the First Amendment provide
protections against forced disclosure of newsgathering
materials)).)

Plaintiff's allegations regarding the Article's sourcing
are insufficient to support the inference that Cole acted with
actual malice in publishing the Article because they are
"standing alone," despite Plaintiff's assertions to the
contrary. In the foregoing sections, the Court has rejected each
of Plaintiff's other bases for inferring actual malice. Even
taken together, Plaintiff's allegations are not enough to
"buttress" the inference of actual malice that one might draw

from Cole's use of anonymous sources in the Article. <u>Cabello-Rondon</u>, 720 F. App'x at 89.

### V.   **Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is <u>GRANTED</u>. Because Plaintiff was aware of the deficiencies in his Complaint when he filed the AC and his subsequent amendments failed to address these deficiencies, Defendants' motion is granted with prejudice. <u>See</u> <u>Kling v. World Health Org.</u>, 532 F. Supp. 3d 141, 153 (S.D.N.Y. 2021) (citing <u>Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n</u>, 898 F.3d 243, 257-58 (2d Cir. 2018) ("[i]n general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend").

The Clerk of the Court shall close the open motions (dkt. nos. 41 and 45) and close case number 21-CV-10075.


**SO ORDERED.**

Dated:     July 12, 2023
           New York, New York

_Loretta A. Presba_
LORETTA A. PRESKA
Senior United States District Judge